## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 21, 2013

No. 12-60757

Lyle W. Cayce
Clerk

CAREY SALT COMPANY, a Subsidiary of Compass Minerals International, Incorporated,

Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

Before SMITH, GARZA, and SOUTHWICK, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Carey Salt Company ("Carey Salt") petitions for review of a National Labor Relations Board ("Board") decision finding that the company violated Section 8(a)(1), (3), and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (3), (5). *See Carey Salt Co.*, 358 N.L.R.B. No. 124, 2012 WL 4021866 (Sept. 12, 2012) [hereinafter Board Decision]. The Board cross-petitions for enforcement of its order. Because we conclude that substantial evidence on the record considered as a whole supports findings material to all terms of the order except for the order's mandate that Carey Salt cease and desist from

No. 12-60757

presenting regressive bargaining proposals for the purpose of frustrating negotiations, we enforce the order in part and vacate it in part.

## I

Carey Salt operates a rock salt mine in Cote Blanche, Louisiana. In February of 2010,[1] the company entered into negotiations with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and Local Union 14425 ("Union") over the terms of a new collective-bargaining agreement. Carey Salt and the Union enjoyed forty years of successful bargaining history. Twice during the course of the 2010 negotiations, however, Carey Salt unilaterally implemented offers after claiming, over Union protests, that talks had reached a valid impasse. In response to the first implementation and other alleged unfair labor practices, employees went on strike from April 7 to June 15.

The disputes underlying this case arose in March of 2010. Between February 8 and March 19, the parties had met fourteen times to bargain over the terms of a new agreement that would replace the one expiring on March 24. By March 10, Union negotiators had accepted Carey Salt's proposals on benefits and severance, but they had largely refused to yield on Carey Salt's three "core" issues of overtime distribution, alternate shifts, and cross-assignment. These issues had been the subject of the company's long-standing operational concerns, and even the Union had conceded that vague overtime policies invited abuse and excessive overtime levels. On March 10, the Union proposed a one-year trial period for the new shift schedule, but the parties failed to agree on an escape clause governing the parties' options following the trial period. The March 12 meeting witnessed no progress.

---

[1] All dates are in the year 2010 unless otherwise noted.

No. 12-60757

On March 18, after an initial confrontational discussion of wages, the Union requested a "final" offer from Carey Salt. According to the Union representative, when making this request, he had explained to Carey Salt representatives that his purpose was merely to obtain membership feedback on the offer's terms ahead of the prior contract's expiration. Moreover, he claims that he explicitly conveyed his intent to return to negotiations in the event of the offer's rejection by the membership vote. Carey Salt representatives claim that they asked for confirmation that the Union wanted a final offer, and deny that they understood the requested offer to be a potential basis for continued talks.

On March 19, Carey Salt negotiators presented their final offer. Featured in the offer were terms consistent with the company's position on its three core issues—new overtime rules, new shift schedules, and the elimination of a letter of understanding restricting cross-assignment. The offer included all items on which tentative agreement had been reached but omitted certain items that, while not yet secured by tentative agreement, Carey Salt had integrated into its own earlier proposals. These omitted items consisted of expanded job classifications eligible for hazard pay and the new shift trial period. On the other hand, the offer included a 2.5 percent year-on-year wage increase, a departure from the company's previous proposal to not increase wages at all.

The Union negotiator confirmed that Carey Salt's omissions were "intentional" and was disappointed that the offer's terms were not as favorable as what earlier talks had seemed to place within reach. A Carey Salt negotiator later conceded that he suspected the omissions would make the offer harder to "sell" to the membership. Indeed, on March 24, the Union membership voted to reject the offer. The Union representative immediately contacted the Carey Salt team and requested to meet; the latter agreed and extended the existing contract to March 31.

No. 12-60757

On the morning of March 31, the parties met for a short, but consequential, two-and-a-half hours. The Union representative explained membership concerns, which both sides acknowledged surfaced no new issues. Carey Salt negotiators, having confirmed the Union's rejection of the final offer, then declared impasse over Union protest. Company negotiators explained that the Union had asked for a final offer, and then departed from the meeting site by approximately 11:30 A.M., thereby executing the "end game" outlined by Carey Salt's CEO the previous day. In the afternoon, the Union representative tried unsuccessfully by phone and email to bring Carey Salt negotiators back to the table by explaining that he had new proposals that would "move in a meaningful way" toward Carey Salt's positions on shift scheduling and other issues, and that a federal mediator was available. The Union membership, at a special meeting later in the day, reconsidered but again voted to reject the final offer. That night, a Carey Salt negotiator confirmed that the company was unilaterally implementing its March 19 offer.

The parties communicated minimally in April. On April 1, in the wake of the March 19 offer's implementation, the company confirmed that, having reached impasse, it would not meet again unless the Union accepted the offer in full. On April 7, the Union, believing the March 31 implementation to be an unfair labor practice, voted to strike. At the Union's request, the parties held an off-the-record meeting on April 20 to allow the Union's director to understand Carey Salt's concerns.

On April 30, the federal mediator's efforts succeeded in bringing the parties back to the negotiating table, and the revived talks produced a "modified final proposal." However, on May 6, the Union membership rejected this offer and continued its strike. On May 25, Carey Salt negotiators presented a revised offer that rolled back prior concessions and increased the number of core issues

4

No. 12-60757

to seven. This offer included a merit-based system for recalling workers that replaced the expired agreement's seniority-based system.

In June, the parties faced continued stumbling blocks. Carey Salt rejected Union proposals and insisted on acceptance of its seven core issues. On June 15, employees ended their strike, but little progress resulted. The company recalled strikers by merit rather than by seniority, prompting further Union discontent. After more meetings, a failure to agree, and the Union's refusal to vote on a June 23 offer, Carey Salt, claiming impasse, again unilaterally implemented changes in terms and conditions of employment.

The Union brought charges alleging unfair labor practices, and the Board's General Counsel issued a complaint. Administrative Law Judge ("ALJ") Margaret G. Brakebusch found that Carey Salt had violated Section 8(a)(3) and (1) of the Act by failing to reinstate employees engaged in the unfair labor practice strike, and Section 8(a)(5) of the Act by failing to bargain with the Union in April 2010. Additionally, the ALJ found that the company had violated Section 8(a)(5) and (1) of the Act by making unilateral changes in employment terms and conditions in the absence of impasse, conditioning bargaining over mandatory subjects of bargaining on Union concessions, presenting a regressive proposal on or about May 25 that aimed to frustrate agreement, and improperly treating employees who engaged in the unfair labor practice strike beginning on April 7.[2] Board Decision at 29–30. Carey Salt filed exceptions to the ALJ's decision, but the Board adopted the ALJ's findings and order, with certain modifications. *Id.* at 1–4.

The Board's final order requires Carey Salt to cease and desist from its violations of the Act and to affirmatively remedy its violations. Specifically, Carey Salt was ordered to restore terms and conditions of employment to their

---

[2] Other violations are not challenged by Carey Salt, as noted *infra*.

No. 12-60757

pre-March 31 status until agreement or valid impasse is reached, make whole employees who suffered losses as a result of the March 31 implementation or the company's failure to reinstate strikers, and post at the mine copies of a notice explaining the company's obligations. *Id.* at 2–4.

Carey Salt petitions us for review of the order and submits that the Board's findings are not supported by substantial evidence. The Board cross-petitions for enforcement of its order.

## II

Section 10(e) of the Act instructs us to accept the factual determinations of the Board that are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012). Furthermore, we must uphold the Board's "credibility determinations . . . unless they are 'inherently unreasonable or self-contradictory.'" *Id.* at 665 (quoting *Cent. Freight Lines, Inc. v. NLRB*, 666 F.2d 238, 239 (5th Cir. 1982)). In particular, an ALJ's credibility choice, adopted by the Board, merits "special deference, unless it is based on inadequate reasons, or no reasons." *Reef Indus., Inc. v. NLRB*, 952 F.2d 830, 836 (5th Cir. 1991). Additionally, we must have a "compelling reason" based in evidence to overturn a credibility choice, beyond merely a party's urging us to adopt its version of the facts. *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 482 (5th Cir. 2001) (refusing to disturb credibility determination "[i]n the absence of any showing" that testimony relied upon by ALJ was "incredible").

Our deference, however, has limits. We must "consider the whole record," and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Moreover, a decision by the Board that "ignores a portion

No. 12-60757

of the record" cannot survive review under the "substantial evidence" standard. *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983) (reversing finding of employer's anti-union animus where Board ignored all management testimony and unfavorable testimony by discharged employee).

We review the Board's conclusions on matters of law de novo. *NLRB v. Arkema, Inc.*, 710 F.3d 308, 315 (5th Cir. 2013) (citing *El Paso Elec.*, 681 F.3d at 656).

## III

The Board, adopting the ALJ's decision, found that Carey Salt violated Section 8(a)(5) and (1) of the Act on both March 31 and June 27, by unilaterally implementing changes to employment terms during negotiations in the absence of impasse. On appeal, Carey Salt contends that because the parties had bargained to impasse, both implementations were lawful.[3] The parties agree that if the March 31 implementation is deemed unlawful, then the strike, which responded to the implementation, was a protected unfair labor practice strike from its commencement on April 7.[4]

---

[3] On appeal, Carey Salt submits that, alternatively, its unilateral changes were lawful under another exception that allows unilateral changes when an employer provides notice and an opportunity to respond, and when the union fails to bargain with appropriate diligence. *See NLRB v. Pinkston-Hollar Constr. Servs., Inc.*, 954 F.2d 306, 311–13, 313 n.6 (5th Cir. 1992). Carey Salt concedes that before the Board, it did not raise this particular defense and instead relied only on the impasse defense. Carey Salt Reply Br. 12 n.2. Accordingly, under Section 10(e) of the Act, Carey Salt has waived its alternative defense. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

[4] Carey Salt does not contest the Board's third finding of an unlawful implementation of various terms and conditions of employment, occurring on May 22. We do not disturb this finding, but we cannot automatically enforce Part 1(d) of the order, mandating in general prospective terms that Carey Salt cease and desist from unlawful unilateral implementation, without examining the company's challenges to the two other findings of unilateral implementation. We further note that neither the May 22 nor June 27 implementation, even if an unlawful unfair labor practice, affects the Board's determination of whether the strike is a protected unfair labor practice strike. An unfair labor practice strike must be caused by

7

No. 12-60757

The determination of whether a negotiation reached impasse "is particularly suited to the Board's expertise as fact finder." *NLRB v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1011 (5th Cir. 1990) (citing *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir. 1982)). Accordingly, we review determinations about impasse as we would any factual finding, under the "substantial evidence" standard. *Id.* (citing *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1317 (5th Cir. 1988)).

Section 8(a)(5) of the Act imposes on employers a duty to bargain collectively with employee representatives. 29 U.S.C. § 158(a)(5). Section 8(a)(1) obligates the employer to refrain from limiting employees' exercise of their rights. *Id.* § 158(a)(1). Generally, an employer breaches these duties when it unilaterally implements a change in the terms and conditions of employment during contract negotiations. *See id.* § 158(d) ("[N]o party" to a collective-bargaining contract covered by the Act "shall terminate or modify such contract" absent specified conditions.); *Huck Mfg.*, 693 F.2d at 1186.

We have recognized, however, that when an employer and union bargain to impasse, the employer may unilaterally implement changes in contract terms, so long as the changes were previously offered during negotiations. *See Huck Mfg.*, 693 F.2d at 1186. Impasse is reached when "further discussion [is] futile . . . in view of all the circumstances of the bargaining." *Powell Elec. Mfg.*, 906 F.2d at 1011. In particular, this futility requires that "*neither party . . . be*

---

an unfair labor practice. *Gulf States Mfrs., Inc. v. NLRB*, 579 F.2d 1298, 1327 (5th Cir. 1978). The May 22 violation, conceded by Carey Salt, did not in fact cause the strike. This unilateral implementation was not alleged by the Acting General Counsel until facts surfaced during testimony in preparation for administrative hearings. The union cannot and does not claim to have been motivated to strike by what was unknown to it at the time. As for the June 27 implementation, because the strike ended on June 15, any action by the company following the strike could not have caused it.

No. 12-60757

willing to compromise." *Id.* at 1011–12 (quoting *Huck Mfg.*, 693 F.2d at 1186) (emphasis in original).[5]

Good-faith bargaining is a "necessary precondition" to a finding of impasse. *Elec. Mach. Co. v. NLRB*, 653 F.2d 958, 963 (5th Cir. 1981); *see also Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 505 (5th Cir. 2002) (concluding that failure to supply necessary information constituted bad faith and thereby "preclude[d] a finding of a genuine impasse"). At impasse, "the parties, despite the *best of faith*, are simply deadlocked." *Huck Mfg.*, 693 F.2d at 1186 (quoting *NLRB v. Tex-Tan, Inc.*, 318 F.2d 472, 482 (5th Cir. 1963)) (emphasis added). The precondition of good faith comports with the statutory requirement for good-faith collective bargaining; without good faith, the bargaining itself is unlawful, as is any impasse purportedly reached therein. *See* 29 U.S.C. § 158(d) (requiring parties to "confer in good faith"). The statute provides explicitly, however, that the duty of good-faith bargaining does not "compel either party to agree to a proposal or require the making of a concession." *Id.*

We review the Board's findings regarding good faith with heightened deference in light of the complex subjective inquiry required. The determination of an "absence of good faith [is] one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation." *NLRB v. Big Three Indus., Inc.*, 497 F.2d 43, 46–47 (5th Cir. 1974). To assess the Board's finding of a lack of good faith, we must "examine the totality of the employer's conduct, both at and away from the bargaining table." *NLRB v. Hi-Tech Cable Corp.*, 128 F.3d 271, 276 (5th Cir. 1997); *see also Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 854–55 (5th Cir. 2010) (engaging in fact-specific analysis). But misconduct away from the bargaining table must relate to

---

[5] Carey Salt does not seek to invoke the narrow "business necessity" exception, which allows an employer to sustain operations during an "emergency situation caused by a strike." *Powell Elec. Mfg.*, 906 F.2d at 1014.

conduct at the table to justify an inference of bad faith. *Hi-Tech Cable*, 128 F.3d at 277. In undertaking this often complex inquiry, we have vigilantly enforced the Act's protection of a party's good-faith bargaining position. *See, e.g.*, *NLRB v. Bancroft Mfg. Co., Inc.*, 635 F.2d 492, 494 (5th Cir. 1981) (concluding that employer's mere refusal to yield did not constitute bad faith); *Chevron Oil Co. v. NLRB*, 442 F.2d 1067, 1072–73 (5th Cir. 1971) (same). Notwithstanding this prohibition of substantive judgment, the Board is not barred from considering the substance of proposals in order to ferret out "empty talk," the "mere surface notions of collective bargaining." *NLRB v. F. Strauss & Son, Inc.*, 536 F.2d 60, 64 (5th Cir. 1976) (quoting *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir. 1953)). Good faith is inconsistent with a "charade concealing a desire to frustrate agreement," notwithstanding conduct that "on its face" resembles bargaining. *Glomac Plastics, Inc. v. NLRB*, 592 F.2d 94, 98 (2d Cir. 1979).

The Supreme Court, too, has signaled the importance of good faith by recognizing that parties may "intentionally" bring about impasse, but only as a "device to further, rather than destroy, the bargaining process." *Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 412 (1982) (quoting *Charles D. Bonanno Linen Serv., Inc.*, 243 N.L.R.B. 1093, 1094 (1979)). Moreover, the Court has explained that the duty to bargain in good faith requires more than "the mere meeting" of the parties; negotiations must grow out of a "serious intent to adjust differences and to reach an acceptable common ground." *NLRB v. Ins. Agents' Int'l Union, AFL-CIO*, 361 U.S. 477, 485 (1960).

Even in *Taft Broadcasting Company*, good faith was the central factor in the Board's analysis. In that case, the Board enumerated five factors that aid in determining whether an impasse existed, and both parties here urge us to apply them. These factors are (1) the parties' bargaining history; (2) the parties' good faith; (3) the duration of negotiations; (4) the importance of issues generating disagreement; and (5) the parties' contemporaneous understanding

of the state of negotiations. *Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967), *enforced sub. nom Am. Fed'n Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968). All five factors are probative of impasse, but in the very same section of its decision, the Board explained that impasse is reached "after *good-faith* negotiations have exhausted the prospects of concluding an agreement." *Id.* (emphasis added). In applying the factors, the Board emphasized that "no evidence" suggested bad faith had tainted the parties' ultimately unfruitful efforts during twenty-three bargaining sessions. *Id.* Indeed, the D.C. Circuit, in enforcing the *Taft* decision, determined that this understanding of impasse "governed" the case and cited the Board's formulation verbatim, including the requirement of good faith. *Am. Fed'n Television & Radio Artists*, 395 F.2d at 624.

We use the *Taft* factors to frame our analysis, mindful, however, that under our precedents and *Taft* itself, substantial evidence of a lack of good faith must preclude an impasse finding.

**A**

Carey Salt contends that substantial evidence does not support the Board's conclusion that no impasse existed on March 31, when the company unilaterally implemented its March 19 offer. Specifically, Carey Salt alleges that the Board overlooked evidence that undermines its analysis under each of the *Taft* factors. We consider each of the alleged errors.

**1**

Carey Salt challenges many aspects of the ALJ's findings under the first three *Taft* factors, emphasizing that it had a right to stand on its final offer and, given the Union's rejection, to seek impasse after many weeks of good-faith negotiations.

The ALJ's decision consolidated its analysis of the first three *Taft* factors—the bargaining history, length of negotiations, and good faith of the

parties—and concluded that the factors collectively favor a no-impasse finding. The ALJ first conceded that, viewed over the long term, the factors suggest impasse. For instance, the parties enjoyed a forty-year history of successful negotiations, and there was no complaint of bad faith in the instant negotiation prior to Carey Salt's March 31 implementation. Board Decision at 11. The ALJ, however, then narrowed her temporal focus to the final days of negotiation and, in particular, Carey Salt's plan to swiftly declare impasse on March 31. The ALJ took issue with "sometimes short" meetings toward the end of the bargaining period, late commencement of negotiation over wages on March 18, Carey Salt's regressive March 19 proposal that "effectively insured that no meaningful negotiations could follow," and Carey Salt's desire to end negotiations using an impasse declaration. *Id.*

The ALJ concluded that impasse was precluded by the "immediate" bargaining history and Carey Salt's bad-faith conduct. *Id.* at 12. The Board chose not to rely on the ALJ's finding that the substance of the March 19 proposal eliminated the possibility of future negotiation, and the Board emphasized that regressive proposals were not per se illegal. *Id.* at 1 n.5. Nonetheless, the Board concluded that the regressive March 19 proposal was an element of Carey Salt's "overall plan to frustrate agreement," and that therefore no valid impasse existed on March 31.[6] *Id.*

We must determine whether the Board's and ALJ's analyses under the first three *Taft* factors point us to substantial evidence on the record considered

---

[6] Carey Salt suggests that by disclaiming elements of the ALJ's reasoning and finding an "overall plan to frustrate agreement," the Board might have intended to replace completely the ALJ's factual analysis under *Taft*, and that the phrase signals an entirely new conclusion without an evidentiary basis. We see no grounds for such an interpretation, especially since the Board explained its modifications as only "minor analytical differences." Board Decision at 2. The phrase "overall plan to frustrate agreement" merely re-characterizes the ALJ's original analysis of Carey Salt's activities on and just before March 31, under the three factors of bargaining history, good faith, and negotiation length.

as a whole supporting the no-impasse finding.  We conclude that there is such evidence, based on facts in the record establishing Carey Salt's bad faith, since bad faith precludes any finding of impasse.  *Elec. Mach.*, 653 F.2d at 963 (holding that good faith is "precondition" for impasse).[7]

The evidence of Carey Salt's bad faith hinges, we believe, on the Union's explanation, credited by the ALJ and Board, that when it requested the final offer on March 18, it made explicit to Carey Salt negotiators that talks would resume in the event of a membership vote rejecting the offer.  If the Union's account were untrue, and both parties in fact understood the final offer to be truly "final" without recourse to further talks, then the Board has no basis for faulting Carey Salt's plan to declare impasse on March 31.  If, however, the Union's request for the offer made it clear that the parties would continue negotiations in the event of rejection, then we will need to examine whether Carey Salt's actions are consistent with good-faith bargaining.  We begin, then, with the ALJ's discussion of the final offer request.[8]

The facts surrounding the final offer are somewhat murky.  The company claims that because the Union had asked explicitly for a "final offer" on March 18, the Union necessarily understood the parties to be at impasse on March 31, when Carey Salt chose to stand on its offer after the Union membership's vote

---

[7] We are further bound by the Supreme Court's explication of the duty to bargain in good faith as requiring more than "the mere meeting" of the parties; negotiations must grow out of a "serious intent to adjust differences and to reach an acceptable common ground." *Ins. Agents' Int'l Union, AFL-CIO*, 361 U.S. at 485.  As explained below, the Court has not suspended this duty when parties have expressed and acted upon a mutual intent to continue talks, and likewise we see no basis for articulating an exception on these facts.

[8] Although the ALJ discussed the final offer in her analysis of the fifth Taft factor (the parties' contemporaneous understanding), we cannot read the decision in a rigidly piecemeal fashion.  Rather, we must consider the record in its entirety, which includes the ALJ decision. *See NLRB v. Yeshiva Univ.*, 444 U.S. 672, 679 (1980) (affirming reviewing court's own factual findings on the record, where Board had made no relevant findings itself); *Universal Camera*, 340 U.S. at 493–94 (holding that ALJ decision is part of record, which reviewing court must consider in full).

to reject it. A Carey Salt negotiator testified that company representatives had asked for confirmation that the Union was "sure" that it wanted a final offer, and that he never understood that the offer might serve as a basis for continued talks. Tr. at 902–903.[9] On the other hand, after delivering the purportedly final offer, the same Carey Salt negotiator asked what would happen if talks continued, as conceded by his colleague on cross-examination. Tr. at 1127. The Union negotiator testified on both direct and cross-examination that, when requesting the final offer, he had explicitly informed the company of his plan to continue talks even if the membership rejected the offer, and that the purpose of the request was merely to obtain membership feedback before the prior contract's expiration. Tr. at 261, 461.[10]

Faced with evidence supporting these conflicting accounts, the ALJ permissibly credited the Union representative's testimony that the parties did not in fact understand the final offer to be truly "final," and that follow-on negotiations were expected. Board Decision at 13. The ALJ justified this choice with adequate reasons. *See Reef Indus.*, 952 F.2d at 836. The decision recounted the Union representative's statements to Carey Salt negotiators that future talks were not foreclosed and explained that "no credible record evidence" proved that the request for a final offer "directly communicated or even implied" that the Union would give up negotiating thereafter. Board Decision at 13. Absent indications that the Board ignored substantial parts of the record, we cannot

---

[9] In response to a question on cross-examination about whether he understood that the request for a final offer was merely an attempt "to take the temperature of the membership," Gord Bull testified that he "didn't understand that." Tr. at 903.

[10] Union representative Gary Fuslier testified: "So the purpose of asking the company to give us a proposal, I needed to get that back to the membership, so I could—and I told [lead Carey Salt negotiator Victoria Heider], in case this gets rejected, so we can get back to the table and share with the company the true feelings of the membership . . . ." Tr. at 261.

disturb this credibility determination. *El Paso Elec.*, 681 F.3d at 665; *Lord & Taylor*, 703 F.2d at 169.

Crucially, Carey Salt never conclusively refuted the Union's account of the March 18 request for a final offer, and we thus have no "compelling reason" to overturn the ALJ's credibility choice. *Poly-America, Inc.*, 260 F.3d at 482. Before the ALJ, Carey Salt representatives never directly contradicted the Union negotiator's account of his request for the final offer. Tr. at 90, 831 (claiming only that Union team suddenly asked for the final offer). Rather, one Carey Salt negotiator testified that he "didn't understand" that the purpose of the request was to seek membership feedback. Tr. at 903. Carey Salt focused its arguments before the ALJ on the meaning of the word "final," but even this linguistic analysis did not fatally undermine the Union's account. While the Union negotiator explained that "final" can have a special meaning and asking for such an offer entails certain risks, Tr. at 460, he also explained that in many contexts, a "final" offer can merely mark the end of an intermediate stage in negotiation, Tr. at 426.[11] Finally, on appeal, Carey Salt does not challenge this credibility choice.

If the final offer was in fact neither explained nor understood as truly final, then the sequence of events "both at and away from the bargaining table" supports the Board's faulting Carey Salt's bad-faith conduct in the last days of negotiations leading up to March 31. *Hi-Tech Cable*, 128 F.3d at 276. First, as already established, the Union had explicitly informed Carey Salt that it would return to negotiations in the event the membership rejected the "final" offer. On March 24, immediately after the rejection vote, Carey Salt confirmed its willingness to meet again on March 31. Next, the lead Carey Salt negotiator

---

[11] Gary Fuslier explained: "Final doesn't mean final, because they [the offers] continue to change. This is my final. Tomorrow this is my last final. Tomorrow this is my best final . . . I've heard them all." Tr. at 426.

made travels plans that would require her to depart the site of the final meeting after just a few hours. Then, the CEO detailed the "end game," a plan for a swift impasse declaration and unilateral implementation following the anticipated rejection. Board Ex. 10 at 1. Finally, at the March 31 meeting, company negotiators merely confirmed the Union's rejection of the offer before declaring impasse, departing abruptly, and refusing further talks. Board Decision at 11–12; Tr. at 270–72. The ALJ concluded that this sequence of events evinced a lack of desire to reach agreement, Board Decision at 11–12, and the Board adopted the same finding in faulting Carey Salt's "overall plan to frustrate agreement," *id.* at 1 n.5.

Bearing in mind our deferential posture in reviewing determinations of bad faith, *Big Three Indus.*, 497 F.2d at 46–47, we are satisfied that the evidence relied upon is substantial enough. Carey Salt deployed impasse not to "further," but to "destroy" the negotiation, at a critical point when the parties had explicitly agreed to return to the table. *Bonanno Linen*, 454 U.S. at 412. Despite the company's claims that it satisfied the formal requirements of good-faith bargaining by providing an offer, agreeing to meet, and listening to Union concerns, substantial evidence supports the Board's conclusion that the company's true intent was to forgo agreement and rush to unilateral implementation. In explaining why conduct consistent with formal bargaining can still fall short of good faith, the Board aptly invoked the Supreme Court's guidance in *Insurance Agents' International Union*; ultimately, the Board must determine whether the parties manifested a "serious intent to adjust differences." *Ins. Agents' Int'l Union*, 361 U.S. at 485; *see also Glomac Plastics*, 592 F.2d at 97–99 (upholding Board finding of bad faith where withdrawal of concessions aimed to prevent agreement). Here, the Board permissibly concluded that although Carey Salt representatives met with the Union negotiator on March 31, they had already paved the way for impasse by planning

directly for an impasse declaration and then failing to return earnestly to talks as the Union had expressly requested.

We acknowledge that the company had good-faith reasons behind its positions on the core issues, and that the Board may not "sit in judgment on the terms of the agreement." *Gulf States Mfrs.*, 579 F.2d at 1317. Nonetheless, here, the Board was not making a substantive judgment, but calling a procedural foul. Here, the Union had expected continued bargaining, had made that expectation explicit when requesting the final offer, and had come to the table on March 31 prepared to begin a discussion of items on which Carey Salt had expressed tentative openness. Tr. at 275.[12] Under these circumstances, an employer may not use a "final" offer's anticipated rejection to engineer a premature impasse and swift unilateral implementation. If an employer wishes to bring an end to talks, it must do so by good-faith bargaining, not by seizing upon magic words, abstracted from their context. *Cf. TruServ Corp. v. NLRB*, 254 F.3d 1105, 1115 (D.C. Cir. 2001) (explaining that although merely labeling an offer as "final" is not dispositive, rejection of final offer led to impasse where company bargained in good faith and no record evidence controverted offer's status as "last, best, and final").

---

[12] The Union's lack of a proposal, however, does suggest that at least by 11 A.M., it did not see further room for compromise, as discussed under our review of the fifth *Taft* factor (contemporaneous understanding of the parties). *See infra* Section III.A.3. This inference, however, does not detract from the weight of the substantial evidence of Carey Salt's bad faith in executing a plan to bring talks to an abrupt end. The two inquiries are fundamentally distinct: Assessment of bad-faith bargaining requires the Board to analyze the parties' conduct and intentions leading up to the impasse declaration, while the contemporaneous understanding of the parties is concerned with whether the parties shared a belief that further talks would be futile. In other words, to reach a valid impasse, the parties must not only believe that they have nothing more to give, but also arrive at this belief through good-faith bargaining. Here, Carey Salt's sudden, bad-faith refusal to bargain where further talks had been planned negates a finding of impasse, even if no substantial evidence proves that the Union was willing to bargain further at the moment that Carey Salt declared impasse.

17

No. 12-60757

Although there is substantial evidence that Carey Salt's conduct fell short of good faith during the week leading up to March 31, we recognize its good-faith efforts throughout most of this negotiation. Nonetheless, good-faith bargaining is a "necessary precondition" to reaching valid impasse. *Elec. Mach.*, 653 F.2d at 963. In determining whether this precondition is satisfied, we do not think that the Board or this court must balance the entirety of conduct in negotiations to determine whether certain bad-faith conduct is outweighed by other indications of good faith, thereby redeeming a party's "net" good-faith score. *Taft* provides that parties reach impasse only after "good-faith negotiations have *exhausted* the prospects of concluding an agreement," and we understand such "exhaust[ion]" to mean that good-faith efforts must persist until all avenues for compromise are closed. *Taft Broad.*, 163 N.L.R.B. at 478 (emphasis added).[13] The Act itself sets a high bar and requires parties in collective bargaining to "confer in good faith." 29 U.S.C. § 158(d). We decline today to create a new exception to this duty that would apply after a number of weeks of bargaining, when an employer, weary of discussion, finds it more convenient to declare impasse rather than honor the parties' stated plans to make another genuine attempt to seek common ground.

However, we do take issue with one component of the Board's reasoning about Carey Salt's bad faith. There is no substantial evidence supporting the Board's finding that the March 19 regressive proposal was part of the company's "overall plan to frustrate agreement." Accordingly, the Board's narrative of bad-faith bargaining should not have encompassed the March 19 offer.

---

[13] Other circuits have held that impasse on "a single critical issue" alone could lead to overall impasse. *See, e.g.*, *Erie Brush & Mfg. Co. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012) (citing *CalMat Co.*, 331 N.L.R.B. 1084, 1097 (2000)). Even if we were to recognize such a principle, we do not see how good-faith bargaining "exhausted" negotiations even for the core issues, when the parties had agreed to meet again following rejection by the Union, and substantial evidence supports the Board's finding that Carey Salt's conduct at and leading up to the March 31 meeting did not reflect a genuine desire to reach agreement.

No. 12-60757

In challenging this finding, Carey Salt directs us to two other findings by the Board that it claims are inconsistent with locating bad faith in the March 19 offer itself. The Board found first that the Union did not complain of any bad-faith conduct before March 31, Board Decision at 11, and, secondly, that the substance of the March 19 offer was not so patently regressive as to foreclose bargaining, *id.* at 1 n.5. In our view, these two findings do not alone preclude a linkage between the March 19 offer and the plan to frustrate bargaining detailed above. Nonetheless, no substantial evidence supports such a linkage, and we therefore decline to fault the March 19 offer on this basis.

We first explain why Carey Salt's two contentions fall short. First, as to the lack of a Union complaint about any pre-March 31 conduct, we have held that any findings not based strictly on the complaint still merit enforcement so long as the issues were fully litigated. *See Huck Mfg.*, 693 F.2d at 1187–88. Carey Salt's "end game" did not come to fruition until March 31, when company negotiators declared impasse and refused to engage in further discussion, and the Union's complaint targeted this conduct rather than the March 19 offer itself. However, the issue of Carey Salt's plans to end the March 31 meeting with an impasse declaration was fully litigated before the Board, and the plan's centerpiece was the Union's rejection of the March 19 offer. Board Decision at 11. Therefore, the lack of any specific complaint about the company's conduct prior to the March 31 impasse declaration does not alone preclude the Board's finding that the March 19 offer was a regressive proposal that fit into an "overall plan to frustrate agreement."

Second, we consider the effect of the Board's modification, disagreeing with the ALJ and explaining that the March 19 offer was not so substantively regressive as to foreclose future talks and, relatedly, that no per se rule bars regressive offers. Preliminarily, we recall that we are not bound by the Board's modifications. *Universal Camera*, 340 U.S. at 493–97 (explaining that reviewing

19

courts consider findings by the Board as part of the record). Nonetheless, our own review of the record leads us to agree with the Board that the March 19 offer, while less favorable than the Union expected, did not necessarily foreclose all future bargaining. Its terms, after all, included an increase in wages not previously offered and all items on which "tentative agreement" had been reached. Tr. at 263–64, 469. Furthermore, we underscore our agreement with the Board's clarification that as a matter of law, regressive offers are not per se illegal. That is, the label "regressive" has no independent legal force absent other circumstances. However, we reject the proposition that just because the regressive March 19 offer was not so substantively egregious as to ensure the end of talks, it could not have been part of a plan to derail discussions after its anticipated rejection.

The proper question, then, is whether in fact the link between the March 19 offer and Carey Salt's plan to frustrate agreement rests on substantial evidence. We conclude that it does not. The ALJ bases her reasoning solely on the purported admission by a Carey Salt negotiator that "the regressive changes in the March 19, 2010 proposal made it less attractive and harder for the union bargaining committee to present to the membership." Board Decision at 11. In reviewing the Board's finding of bad faith, we are obligated to consider the "totality of the employer's conduct." *Hi-Tech Cable*, 128 F.3d at 276. While we do not engage in de novo review, "[t]he substantiality of evidence" must withstand "whatever in the record fairly detracts from its weight." *Universal Camera*, 340 U.S. at 488. Our review of the record does not support the conclusion that the March 19 offer was part of Carey Salt's plan to frustrate agreement.

First, we clarify precisely what was omitted from the final offer. Carey Salt had removed items proposed by the Union and incorporated into company proposals during previous sessions, but on which tentative agreement had not

been reached—specifically, provisions regarding hazard pay terms and the alternate shift trial period. The second deletion was inconsequential, since Carey Salt never completely adopted the trial period, even in its own counter-proposals; debate persisted over the escape clause that could terminate the trial period. *See infra* Section III.A.2. As for the hazard pay provisions, the parties had not reached tentative agreement, and even the Union negotiator testified that he merely found the offer to be "unsettling." Tr. at 264; *see also* Tr. at 449 (explaining parties' prior agreement that "nothing was to be deemed final as part of the negotiations until it was a tentative agreement").

Second, the ALJ misconstrues the Carey Salt negotiator's admission. The negotiator conceded on cross-examination only that the omissions "made *that part of the contract* [to which the omissions pertained] less attractive," and that as a result, it would be harder for the Union negotiator to sell the March 19 proposal to the membership. Tr. at 897–98 (emphasis added). As even Counsel for the Board conceded twice during this questioning, the fact that certain deletions would make the relevant portion of the proposal less attractive was merely "a common sense thing." Tr. at 898. Such inconsequential testimony does not prove that the offer overall was somehow calibrated for rejection. Furthermore, the ALJ decision obscures the fact that the March 19 offer included a 2.5 percent year-on-year wage increase. Board Decision at 11.[14] Even if this increase had been in line with what the Union membership had expected, Tr. at 898, it still represented an increase over Carey Salt's prior formal offer of zero. Finally, the March 19 offer included numerous company concessions on benefits, granted over the course of the entire negotiation. Board Decision at 6 (discussing items on which tentative agreement had been reached). Nothing in the March 19 offer suggests that it rises to the level of "empty talk," *F. Strauss*

---

[14] The ALJ observes in passing that "The March 19, 2010 final offer not only included a new wage proposal, but also eliminated a number of items . . . ." Board Decision at 11.

No. 12-60757

*& Son*, 536 F.2d at 64, or that it was a mere "charade" that in fact betrayed "a desire to frustrate agreement," *Glomac Plastics*, 592 F.2d at 98.

The Board is correct in contending that Carey Salt's plan to discontinue negotiations and declare impasse on March 31 was predicated on the Union's rejection of the March 19 offer. However, the terms and context of the offer do not establish that it was intentionally crafted as part of this overall plan. Rather, we conclude that substantial evidence supports a far more plausible alternate account: Carey Salt assembled a final offer in good faith, which the Union membership rejected on March 24. This rejection, and not the March 19 offer itself, set in motion Carey Salt's plan to terminate bargaining and declare impasse, which was made and executed in bad faith and contravened contemporaneous indications to the Union that it would return to bargaining. In other words, the facts do not bear out a connection between the impermissible plan to frustrate bargaining and either the substance or formation of the March 19 offer.

In attempting to construct such a relationship, the ALJ erroneously applied the Board's prior decision in *Valley Oil Company*. 210 N.L.R.B. 370 (1974). The ALJ read *Valley Oil* to stand for the proposition that withdrawal of prior agreed-upon items constitutes bad-faith bargaining. *Id.* at 384–86. First, *Valley Oil* is inapposite because the withdrawn provisions here had not even attained "tentative agreement" status, as the ALJ acknowledged. Board Decision at 11. Furthermore, the Board in that case undertook a highly contextual analysis and explained that changes in position "must be based on some development in the negotiations and not merely because the negotiator changes his mind." *Id.* at 385. The Board found no material "development," and concluded that employer negotiators were merely using fickle tactics to "frustrat[e] arrival at a contract." *Id.* Here, the Union's request for a final offer to take to the membership did signal a significant "development," and Carey Salt

22

accordingly made holistic adjustments to its prior bargaining position, such as increasing wage growth and decreasing hazard pay. *Cf. Chicago Local No. 458-3M, Graphic Commc'ns Int'l Union v. NLRB*, 206 F.3d 22, 29–34 (D.C. Cir. 2000) (discussing *Driftwood Convalescent Hosp.*, 312 N.L.R.B. 247 (1993), and holding employer withdrawal of agreed-upon terms to be lawful where Union failure to ratify proposal before stated deadline provided good cause).

Having reviewed the record, we conclude that substantial evidence supports the Board's finding that Carey Salt acted in bad faith leading up to its impasse declaration on March 31. Good faith bargaining is a prerequisite to achieving a valid impasse. *Elec. Mach.*, 653 F.2d at 963. Accordingly, we hold that substantial evidence on the record considered as a whole supports the Board's finding that on March 31, in the absence of a valid impasse, Carey Salt unilaterally implemented changes to terms and conditions of employment.

However, we hold that substantial evidence does not support the Board's finding that the regressive March 19 proposal was "part of [Carey Salt's] overall plan to frustrate agreement." The link to Carey Salt's plan is too conjectural, and no feature of the March 19 offer or its context suggests bad-faith bargaining.

**2**

Although the foregoing analysis already shows that substantial evidence supports the Board's no-impasse finding, we turn to the remaining two *Taft* factors to clarify points of fact and law on which the Board erred. The fourth *Taft* factor is the importance of the issues giving rise to disagreement. The more important the issues, the more likely that impasse is genuine and not contrived. Carey Salt claims that the Board improperly minimized this factor.

The ALJ began her analysis by acknowledging that the three "core" issues of overtime distribution, alternate shifts, and cross-assignment were of great importance to both the Union and Carey Salt. At stake were significant changes to employees' hours and pay, on the one hand, and long-sought improvements

to the company's operational efficiency, on the other. Board Decision at 12. But the ALJ then cited evidence of "movement" on both sides that purportedly belied claims of importance. According to the ALJ, on March 10, just over a week before the final offer was requested, the Union suggested changes to Carey Salt's alternate shift proposal, and company negotiators incorporated the Union's suggestions into their own proposals. *Id.* at 6, 12.

The ALJ explained that this March 10 exchange signified "movement," which weakened the salience of the core issues' importance, for two reasons. First, the ALJ reasoned that because Carey Salt was willing at one point to compromise, and by implication might continue to display flexibility, the importance of the issues "does not overshadow the other *Taft* factors in the impasse analysis." *Id.* at 12. Second, and similarly, the Union's open "concession . . . on a significant issue" suggested that future compromise was possible, notwithstanding a persistent "wide gap" between bargaining positions. *Id.* at 12 (quoting *Saunders House v. NLRB*, 719 F.2d 683, 688 (3d Cir. 1983)).

We cannot agree with either reason. Regarding the first, the ALJ's determination is based on a flawed reading of the record. As Carey Salt explains on appeal, the company never made any "movement" because it never adopted the Union's trial period proposal in full. Rather, the company had incorporated the general concept of a trial period into its own proposal, with a note that the escape clause was an outstanding point of dispute, and had consistently rejected the Union's escape clause option to revert to the original shifts.[15] Moreover,

---

[15] According to Carey Salt, the ALJ mistook as the company's own proposal a March 10 document summarizing an alternate shift arrangement with a trial period and Union option to revert to the original shifts. As Carey Salt explains, this document was not a company proposal, since it lacked the "DRAFT" label appearing at the top of all company proposals. Rather, this was merely a discussion document capturing the Union's proposal. Board Ex. 5 at 17. Carey Salt's counter-proposal, by contrast, incorporated the trial period proposal, but explicitly removed the Union's option to revert to the original schedule, and tabled the escape clause issue for future discussion. Board Ex. 5 at 18.

according to Carey Salt, the Union negotiator himself disclaimed his earlier testimony that the company had incorporated the Union's trial period in full into its own proposals. Tr. at 468.

On appeal, neither the Union nor the Board contests Carey Salt's detailed treatment of the record, and the Board asserts that the ALJ correctly found that the company adopted the Union's trial period proposal in full. After reviewing the record, we agree with Carey Salt that its receptiveness to the Union's general suggestion of a trial period does not constitute "movement," given the absence of agreement over the critical escape clause. Thus, the ALJ's flawed factual findings regarding the company's "movement" do not provide substantial evidence in support of the Board's no-impasse finding.[16]

The ALJ's second path of reasoning rests upon a conclusion of law, which we review de novo. *Arkema*, 710 F.3d at 315. The ALJ invoked a sweeping proposition, purportedly extracted from the Third Circuit's opinion in *Saunders House v. NLRB*, that a party's un-withdrawn concession, however slight, on any single important issue precludes a finding of overall impasse. *See* Board Decision at 12 (citing *Saunders House*, 719 F.2d at 688). Even if we were to accept the persuasive value of *Saunders House*, the ALJ misstated the holding of that case.

In *Saunders House*, the Third Circuit addressed the narrow question of whether a union's on-the-record concession regarding wage increases constituted

---

[16] Carey Salt contends that the ALJ's misreading of the record, here and elsewhere, rises to the level of "ignoring" the record and, because we have held that such a blatant oversight is incompatible with a decision based on substantial evidence on the record considered as a whole, that the Board's no-impasse conclusion must be reversed. *See Lord & Taylor*, 703 F.2d at 169 (holding that when the Board ignores a portion of the record, the substantial evidence standard cannot be satisfied). This claim is without merit. Here, the Board interpreted Carey Salt's adoption of the general proposal for a trial period as sufficient "movement." This interpretation was erroneous, and, therefore, no substantial evidence therein can support the Board's no-impasse finding. But this ultimate finding is not invalidated by any ignoring of the record.

sufficient movement to preclude impasse, when the employer had not directly rejected the concession, but had previously rejected the same offer communicated in an off-the-record exchange. The court held that while the on-the-record offer was a "significant" concession given its departure from earlier on-the-record offers, it was not "sufficient" to avert an impasse finding. *Saunders House*, 719 F.2d at 687–88. In explaining its decision, the court reasoned that a concession on an important issue could preclude impasse despite "a wide gap between the parties," but that such a concession "must be one that should encourage the parties to believe that further negotiations would not be futile." *Id.* at 688. The move from off- to on-the-record did not clear the sufficiency hurdle, given the employer's prior knowledge of the union's position. Furthermore, in the same case, the court accepted that impasse existed on the equally critical issue of union security despite a significant union concession because, as the court explained, the employer had flatly rejected that "attempted compromise." *Id.*

Here, like the union security concession in *Saunders House*, the Union's proposed trial period with reversion to the original shifts had been roundly rejected by Carey Salt when its March 10 counter-proposal did not incorporate the Union's escape clause. Board Ex. 5 at 18; *see also* Tr. at 468. Even accepting *arguendo* that there was no explicit rejection, the Union's trial period proposal would be equivalent to the insufficient wage concession in *Saunders House*, because sharp disagreement over the escape clause did not encourage confidence in the fruitfulness of future talks. Tr. at 468 (Union negotiator conceded on cross-examination that Carey Salt representatives had emphasized that a Union option to revert to the prior schedule "would never be acceptable.").

The Board thus erred as a matter of law in reasoning that any kind of extended concession, despite rejection and remote chances of fueling future talks, precludes impasse. Such a broad rule would stifle open, exploratory

negotiations on the most critical issues, for fear that even brainstorming would later be deemed "movement" undermining a legitimate claim of impasse. Accordingly, the Board's explication of the importance of the issues presents no substantial evidence to support its no-impasse determination.

**3**

We come to the fifth and final *Taft* factor—the contemporaneous understanding of the parties. The Board determined that the parties had no shared belief that negotiations had, in fact, reached impasse. Carey Salt contends on appeal that no substantial evidence under this factor supports the overall no-impasse finding.

As explained above, Carey Salt submits that the Union's request for a "final" offer was ample evidence of the Union's belief on March 31 that further talks were futile, but we determined that the ALJ made a proper credibility determination, and that therefore, neither party in fact understood the "final" offer request to signal the end of negotiations.[17] However, this conclusion does not end our inquiry. Whether the March 19 offer was truly "final" is an ancillary matter under this particular *Taft* factor. As the ALJ and Board correctly intuit, the core question is whether both parties believed further negotiation to be futile when impasse was declared. *Cf. Powell Elec. Mfg.*, 906 F.2d at 1011–12 (explaining that at impasse, "neither party" must be willing to yield). Even if the Union negotiator returned to the table on March 31 expecting to bargain from Carey Salt's "final" offer, we must determine whether substantial evidence of the lack of a contemporaneous sense of deadlock supports the Board's finding that talks were not at impasse.

The ALJ first explains that the Union's surprise and repeated denials of impasse on March 31 suggest that no impasse existed. Board Decision at 12–13.

---

[17] *See supra* Section III.A.1.

Initial surprise, however, is irrelevant to the question of whether the Union ultimately believed that no further negotiation was possible. *Cf. TruServ*, 254 F.3d at 1118 (reasoning that Board's "focus on abruptness of the Company's Final Offer [and] on the Union's surprise upon receiving it . . . misses the mark"). The Union's denials of impasse, while relevant, are likewise not substantial evidence of its beliefs about the state of negotiations, because as the ALJ herself reasoned, terms such as "impasse" and "deadlock" are non-binding legal conclusions. Board Decision at 12; *see also TruServ*, 254 F.3d at 1117 (concluding that union's "bald statement of disagreement" was insufficient to defeat impasse, without "conduct demonstrating a willingness to compromise further").

The ALJ then cites the Union's conduct as evidence of its genuine belief that negotiations were ongoing. Engaging a federal mediator and taking time to explain the membership's objections would have made no sense, explains the ALJ, had the Union truly believed that further negotiations were futile. Board Decision at 13. This logic, however, is akin to the ALJ's emphasis on the Union's surprise. The proper inquiry is not whether the Union expected or wished to prolong discussions, but whether both parties realized that any discussions would be useless when Carey Salt negotiators declared impasse at 11 A.M. on March 31. *Compare NLRB v. Hi-Way Billboards, Inc.*, 473 F.2d 649, 654–55 (5th Cir. 1973) (parties reached impasse notwithstanding meeting with federal mediator on same day), *with Huck Mfg.*, 693 F.2d at 1186 (explaining that presence of federal mediator at negotiations "immediately before and after the alleged impasse date" is evidence that talks "were continuing at that time" and that no impasse existed). We thus conclude that the Board did not point to

substantial evidence regarding the contemporaneous understanding of the parties in order to support its finding of no impasse.[18]

Nonetheless, because there was substantial evidence of Carey Salt's bad faith leading up to the impasse declaration, we hold that the Board's conclusion that no impasse existed as of the March 31 implementation is supported by substantial evidence on the record considered as a whole. *See supra* Section III.A.1; *cf. Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1083–84 (D.C. Cir. 1991) (declining to review contested finding of bad faith determination and concluding that substantial evidence of short negotiations and lack of contemporaneous understanding sufficed to support Board's no-impasse finding); *Colfor Inc. v. NLRB*, 838 F.2d 164, 167 (6th Cir. 1988) (declining to review four contested *Taft* factors and concluding that substantial evidence of lack of contemporaneous understanding alone supported Board's no-impasse finding).[19] For the same reasons, we hold that substantial evidence supports the Board's conclusion that the strike commencing on April 7 was an unfair labor practice strike. Accordingly, we enforce the relevant portions of the Board's order.

**B**

---

[18] The ALJ, responding to Carey Salt's arguments, also explains that the Union's failure to submit new proposals at the March 31 meeting would not have established impasse "in and of itself." Board Decision at 13. This failure should not have been viewed in strict isolation. By doing so, the ALJ minimized the arc of the entire negotiation, the importance of the core issues, and the disagreements over whether the offer was indeed "final." However, this error is inconsequential. We are concerned strictly with whether substantial evidence supports the ultimate no-impasse conclusion, and we have already determined that there is such evidence.

[19] Two members of the Board held that even if an impasse existed at the moment of Carey Salt's 11 A.M. impasse declaration on March 31, the Union successfully broke this impasse later in the day by its persistent requests for negotiations and explanations of its new proposals. *See Gulf States Mfg. Co. v. NLRB*, 704 F.2d 1390, 1399 (5th Cir. 1983) ("Anything that creates a new possibility of fruitful discussion (even if it does not create a likelihood of agreement) breaks an impasse," including "bargaining concessions, implied or explicit." (internal citations omitted)). We need not consider this alternative no-impasse finding based on the afternoon exchanges because we have already determined that the Board's finding a lack of impasse after the morning meeting is supported by substantial evidence.

Carey Salt further contends that the Board's finding of an unlawful implementation on June 27 in the absence of impasse is not supported by substantial evidence.

The ALJ explained that the *Taft* factors reveal an even clearer lack of impasse at the late June unilateral implementation, as compared to the March implementation. The ALJ noted the shorter bargaining period of seven days, the lack of a contemporaneous understanding of impasse, and a history of negotiations tainted by Carey Salt's earlier bad faith. Board Decision at 24. Moreover, certain terms implemented on June 27 were not previously offered to the Union, thereby bringing the implementation beyond the limits of even the impasse exception. *Id.* at 25.

Carey Salt's claims on appeal are limited. It asserts that under the *Taft* rubric, the parties reached a good-faith impasse after the Union refused to accept the company's seven core issues—three issues that had persisted since the start of negotiations, and four more demands made in May. But the company essentially concedes that the Board may rely on findings of the company's past bad faith if such findings are upheld on appeal.[20]

Carey Salt's claims regarding the June 27 implementation are without merit. As noted above, the Board pointed to a shorter negotiations period and the Union's willingness to continue bargaining on open issues. Furthermore, the Board's uncontested reliance on Carey Salt's earlier bad faith was permissible. As the Board noted, previous bad-faith conduct does not automatically preclude a later finding of good-faith impasse, but in certain cases, unilateral changes can "move the baseline for negotiations" and "alter the parties' expectations about what they can achieve," thereby frustrating the bargaining process. *Id.* at 24

---

[20] "If [the Board's] unfair labor practices conclusions [regarding March 31 and May 22] are not supported by substantial evidence, as contended for herein, the June 27 implementation should be allowed to stand." Carey Salt Br. at 43.

No. 12-60757

(quoting *Alwin Mfg. Co., Inc. v. NLRB*, 192 F.3d 133, 139 (D.C. Cir. 1999)). In this case, such spillover effects are evident in the record, found in the Union negotiator's direct references to the March 31 unlawful implementation in his protestations of Carey Salt's new assertions of impasse. *Id.* at 25. Finally, Carey Salt does not challenge the Board's findings that certain implemented terms were never offered in negotiations, and such findings are based directly on the Union negotiator's testimony on this matter. *See* Tr. at 407–411.

Accordingly, we hold that substantial evidence on the record considered as a whole supports the Board's no-impasse determination regarding the June 27 implementation, and we enforce the relevant portions of the order.

**IV**

The Board, adopting the ALJ's conclusions, found that on three occasions, Carey Salt failed to bargain in good faith as required by Section 8(d) of the Act. 29 U.S.C. § 158(d). The Board found that Carey Salt (1) failed to bargain and conditioned mandatory bargaining upon Union concessions between March 31 and April 30; (2) presented a regressive proposal on May 25 that aimed to frustrate agreement; and (3) conditioned mandatory bargaining on acceptance of certain terms from June 3 to June 22. On appeal, Carey Salt challenges each finding.[21]

Although our review of the Board's findings here is governed by the "substantial evidence standard," we are sensitive to the heightened complexity of assessing the subjective state of good faith. "The line between protected and proscribed conduct is a faint one that shifts with the circumstances of

_____

[21] The parties agree that if the May 25 bargaining proposal is found to be unlawful, then the proposal constitutes an unfair labor practice that prolonged the strike. Additionally, the parties agree that if Carey Salt's bargaining beginning on June 3 is unlawful, then it likewise is an unfair labor practice that prolonged the strike through its final date of June 15. Because we determined that no impasse existed on March 31 and that the strike was thus a protected unfair labor practice strike from its inception, we need not hold that these incidents were additional, later causes of the unfair labor practice strike.

31

negotiation." *Huck Mfg.*, 693 F.2d at 1187. Therefore, we must give "great weight" to the Board's findings. *Id.*; *see also Big Three Indus.*, 497 F.2d at 46–47 (deferring to the Board's finding of lack of good faith, unless "the record as a whole leaves such judgment without reasonable foundation").

Section 8(d) of the Act defines the act of collective bargaining as a mutual duty "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." *Id.* § 158(d). The statute provides explicitly, however, that such a duty does not "compel either party to agree to a proposal or require the making of a concession." *Id.* We need not review again our and other courts' interpretations of the duty to bargain in good faith. *See supra* Section III. We note only one additional principle that guides our analysis below: The Board has held previously that the duty to bargain in good faith is suspended, though not terminated, during impasse. *McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386, 1389 (1996), *enforced*, 131 F.3d 1026 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 937 (1998).

## A

Carey Salt first challenges the Board's two findings regarding the period from March 31 to April 30—that the company refused to bargain in good faith and that it conditioned bargaining over mandatory subjects of bargaining on Union concessions. The facts are sparse but largely undisputed. Just prior to the March 31 implementation, Carey Salt negotiators refused to bargain further, absent the Union's total acceptance of its final offer. An April 1 email exchange confirmed the company's stance. Board Decision at 15. Representatives from both parties met on April 20 for a less formal discussion to inform the Union's director of the company's views, at which "no bargaining" occurred by the Union's request, though Carey Salt contests this characterization. *Id.* at 16. The parties did not meet again until April 30. *Id.* at 15.

No. 12-60757

The ALJ's reasoning is supported by substantial evidence: Carey Salt refused to bargain and required the Union to agree to its final proposal before having further meetings, thereby violating its statutory duty to bargain in good faith in the absence of valid impasse. *See* 29 U.S.C. § 158(a)(5), (d). In the April 1 email exchange that froze discussion for weeks, the lead Carey Salt negotiator explicitly premised her refusal to meet on the earlier impasse declaration.[22] Had the parties reached impasse, the duty to bargain might have been suspended absent changed circumstances.[23]   *See McClatchy*, 321 N.L.R.B. at 1389. However, the impasse defense was invalid here, and Carey Salt's refusal to meet therefore evinced a lack of good faith.

Carey Salt's submissions on appeal are unpersuasive. According to Carey Salt, the Union concedes that the company never refused to meet after April 7

---

[22] In an April 1 email responding to the Union representative's request for bargaining, lead Carey Salt negotiator Victoria Heider explained: "I will again remind you that it was you who specifically asked the Company to put a final offer on the table . . . [H]aving given a final, it does not make any sense to have more meetings like yesterday where all I can say is to repeat that you have our final . . . The Company is not interested in meeting somewhere between our final offer and your current position, whatever that is." Carey Salt Ex. 13 at 10.

[23] We cannot accept the Board's legal conclusion that even if impasse exists, any exercise of economic force, such as a union strike or employer unilateral implementation, automatically and immediately breaks the impasse, thereby reviving the duty to bargain. Such a principle is inconsistent with the very decisions cited by the Board. In *Bonanno Linen*, the Supreme Court explained that impasse is a "temporary deadlock or hiatus in negotiations 'which in *almost all* cases is eventually broken, through either a change of mind or the application of economic force.'" *Bonanno Linen*, 454 U.S. at 412 (quoting Board's decision below, *Bonanno Linen*, 243 N.L.R.B. 1093, 1093–94 (1979)) (emphasis added). One party's application of economic force, in other words, "*usually* breaks the stalemate" and brings the other party back to the table, but whether such "changed circumstances" actually end the impasse is a fact-specific inquiry. *Hi-Way Billboards, Inc.*, 206 N.L.R.B. 22, 23 (1973) (emphasis added); *see also Transport Co. of Tex.*, 175 N.L.R.B. 763, 763 n.1 (1969) (finding that end of impasse resulted from changes "under *all* the circumstances," not from an intervening strike alone (emphasis in original)). Therefore, had impasse existed here on March 31, neither Carey Salt's unilateral implementation nor the Union's strike would have broken the impasse and effected a new bargaining duty absent factual findings that circumstances had changed such that at least one party was willing to re-open negotiations. Because we concluded that no impasse existed, we need not venture further.

33

and even agreed to the April 20 meeting in Houston.  But we see nothing in the circumstances of the Houston meeting to support either the Board's or Carey Salt's positions because the parties had agreed at the time that the meeting was not a negotiation session.[24]  Carey Salt alternatively characterizes the parties' silence as a permissible "delay" in talks, but its reliance on *Chevron Oil* is misplaced.  In that case, a mutual misunderstanding about when an employer needed to submit information delayed a meeting by one month, and the company never refused requests to bargain, as Carey Salt did.  *Chevron Oil*, 442 F.2d at 1070–71.  Carey Salt, in the end, falls back on its assertion that the impasse commencing on March 31 persisted into April, thereby removing any obligation to bargain; we have already disposed of the impasse claim.  *See supra* Section III.A.

We conclude that the Board's finding of Carey Salt's failure to bargain in good faith in April is supported by substantial evidence of the aforementioned lack of impasse and of the company's refusal to negotiate throughout April.  We accordingly enforce the relevant parts of the order.

**B**

Carey Salt challenges the Board's finding that its "regressive" May 25 proposal also constituted a failure to bargain in good faith.  The ALJ emphasized the May 25 offer's role in an "entire pattern of conduct" to prolong the strike and "to avoid an agreement rather than reach one."  Board Decision at 19–20 (citing *Cent. Mo. Elec. Coop.*, 222 N.L.R.B. 1037, 1042 (1976)).[25]  Echoing the ALJ, the

---

[24] On the matter of the April 20 meeting in Houston, Carey Salt misconstrues the facts. The session was not a bona fide bargaining session, because the Union explicitly requested an off-the-record bargaining-free informational session to enhance the Union director's understanding of the situation, Tr. at 303, and Carey Salt agreed to the proposal, *id.*, and no evidence suggests that genuine bargaining took place.  *See also* Tr. at 1088.

[25] The Board modified one portion of the ALJ's findings and order and explained that contrary to the ALJ's conclusions, the May 25 offer did not "leave the Union without any representational rights and employees in a worse position than if they did not have the Union

No. 12-60757

Board explained that its adoption of the ALJ's findings was based on "evidence that [Carey Salt] presented its proposal in an intentional effort to frustrate agreement." *Id.* at 1 n.7.

The ALJ's finding a violation in the May 25 offer is based on a contextual analysis. Here, according to the ALJ, Carey Salt's regressive offer effected a concerted plan to lengthen the strike and to enable the hiring of more replacement workers in the interim. In particular, the ALJ reasoned that Carey Salt not only withdrew concessions, but "knowingly added more demands" that company negotiators knew would be rejected. *Id.* at 19. The ALJ accepted that no per se rule outlaws regressive proposals and that Carey Salt enjoyed greater leverage after surviving the initial weeks of the strike. Notwithstanding these considerations, the ALJ concluded that Carey Salt failed to fulfill its legal duty of good-faith bargaining.

Having examined the record, we conclude that there is no substantial evidence that Carey Salt transgressed the bounds of good faith. The ALJ first recalls Carey Salt's uncontested violation of threatening on April 30 to step up hiring of replacement workers in the absence of agreement. Tr. at 1089. However, this pressure tactic, while unlawful, aimed to expedite negotiations, not delay or avoid agreement. The Board's reliance on an email progress update to the CEO regarding the late May meetings is similarly misplaced. The text of the email update, rather than expressing a desire to delay agreement, in fact conveys precisely the opposite intent. Negotiators wanted to bolster their arguments for "implementing [absence control and safety policies] ASAP," to "move [the Union] along a little quicker [sic]" when they sensed the pace of talks

---

as their collective-bargaining representative." Board Decision at 2. Carey Salt calls our attention to this modification but does not claim that this change alone fatally undermined the ALJ's reasoning. After all, the finding that the May 25 offer was regressive was based on other contextual evidence regarding Carey Salt's "entire pattern of conduct," which evidence we examine and reject below. *Id.* at 19–21.

35

was slackening, and to "try[] aggressively to overcome potential stalling tactics." Board Ex. 10 at 11.[26]

The Board's strongest evidence is another internal email, in which the lead Carey Salt negotiator explains to the CEO that her proposing a meeting date for the following week should "forestall the union calling off the strike before then."[27] Board Ex. 10 at 6. Yet the record reveals no direct "nexus" between the Carey Salt's conduct away from the bargaining table—the email at issue—and its actions at the bargaining table. *Hi-Tech Cable*, 128 F.3d at 277 (concluding that bargaining conduct was not linked to isolated unlawful statements to employee). The email was nothing more than an internal explanation of a scheduling proposal. The Union, fully aware of the risks of prolonging the strike, was free to reject that proposal, and it did not. The Carey Salt negotiator's hope that a later meeting date would lengthen the strike, while justifying heightened scrutiny by the Board, is not alone sufficient evidence of a concerted plan to avert agreement, in light of other evidence to the contrary. Carey Salt rightly reminds us that collective bargaining is a messy process, and that the law permits each side to extract concessions when it has the upper hand. *See NLRB v. Randle-Eastern Ambulance Servs., Inc.*, 584 F.2d 720, 726 (5th Cir. 1978). Although the Board may examine bargaining proposals to detect surface bargaining, having reviewed the record, we determine that there is no substantial evidence to support such a finding here.

We pause to distinguish the permissible May 25 offer from Carey Salt's plans for late March, which the Board properly found to be aimed at frustrating

---

[26] As further evidence that the team was not planning to frustrate agreement, the CEO's email response cautions against moving too quickly, explaining his preference for a slower road to a more robust agreement, over rushing to a weaker contract.

[27] During cross-examination before the ALJ, Heider's testimony on this point was equivocal at best; in the end, she conceded that "this is what it is." Tr. at 126.

agreement.  In late March, Carey Salt seized upon the Union's use of the words "final offer" to terminate a meeting prematurely, swiftly implemented a planned impasse, and refused to bargain further, despite the Union's previously stated expectation of continuing talks in the event of the offer's rejection.  As we have discussed, under those facts, substantial evidence of bad faith supports the Board's no-impasse conclusion.  By contrast, in late May, company negotiators engaged their Union counterparts in two full-day sessions, had a plan of action in case the Union did agree, and expressed no intention to abandon talks.[28]  To be sure, the May 25 offer contained elements that Carey Salt expected the Union would reject initially, and company negotiators knew that impasse was an eventual possibility looming in the distance.[29]  But unlike in March, they were not seeking to derail the negotiation and to declare impasse abruptly, in order to enable unilateral implementation of contract changes.

In light of the foregoing, we hold that substantial evidence does not support the Board's finding that, on May 25, Carey Salt failed to bargain in good faith by presenting a regressive proposal aiming to frustrate agreement.  We have already made the same determination with respect to the March 19 offer.  *See supra* Section III.A.1.  Accordingly, we vacate Part 1(f) of the order, which requires Carey Salt to cease and desist from "[p]resenting the Union with regressive bargaining proposals for the purpose of frustrating the negotiation of a collective-bargaining agreement."

---

[28] *See* Tr. at 322–42 (Heider's testimony summarizing May 25 negotiation); Tr. at 342–53 (Heider's testimony summarizing May 26 negotiation).  Heider's email update to the CEO explains her consideration of the possibility of agreement and her plans to continue talks. *See* Board Ex. 10 at 12 ("If by chance [the Union] did agree on [the five key issues], we would then move on to other issues."); *id.* ("The negotiations are scheduled to continue next Wednesday and Thursday (June 2 and 3).").

[29] Heider explained in her email update that the Carey Salt team was "on target either to reach the perfect contract or bargain to impasse within the ~30 day time frame."  *See* Board Ex. 10 at 11.

No. 12-60757

## C

Carey Salt challenges the Board's finding that from June 3 to June 22, it conditioned further mandatory bargaining on the Union's acceptance of certain terms.[30] The ALJ found that Carey Salt rejected Union proposals and insisted that Union acceptance of its seven core issues would be a precondition to further talks. Board Decision at 23–24.

Carey Salt claims that the ALJ misinterpreted the company's position. It directs us to the Union negotiator's notes explaining that company negotiators sought alignment on core issues not as a condition for further bargaining, but as a requirement "in order to get to a [collective-bargaining agreement]." *See* Carey Salt Ex. 31 at 21. While this distinction is important, it does not undermine the substantial evidence that the company indeed established conditions not only for agreement, but also for bargaining over topics including the mandatory subject of wages.[31] Carey Salt then asserts that its additional offers on June 17 and June 22, which took a more conciliatory stance, preclude a finding of unlawful conditional bargaining. While these offers demonstrated certain flexibility, the

---

[30] We do not consider evidence from June 23, discussed in the Board decision, because the ALJ's conclusion states explicitly that Carey Salt "engaged in the unlawful conduct [of conditioning mandatory bargaining upon Union concessions] *only* during the period of time between June 3 and June 22, 2010 . . . ." Board Decision at 24 (emphasis added).

[31] *See* Tr. at 365; Tr. at 373 (indicating that Union had proposed higher wage increases on June 2, and that wages were one of the other issues over which Carey Salt, on June 3, refused to bargain until the Union accepted the core issues); Tr. at 373 ("[Carey Salt negotiators] were not going to *discuss* those issues [including wages] . . . we had to accept their seven core issues, or we would not get a contract.") (emphasis added); Tr. at 1137 (Heider's testimony on cross-examination conceding that she stated on June 3 that although the company had "movement," negotiators would not "use it unless and until the union accepts . . . [its] priorities," and that "[t]here is no incentive for [Carey Salt] to talk about other things that are not priorities . . . .").

record shows that Carey Salt maintained its position of refusing to discuss wages and other issues until the Union acquiesced to its core demands.[32]

Substantial evidence thus supports the ALJ's finding that Carey Salt unlawfully conditioned mandatory bargaining on first obtaining concessions. We enforce the relevant parts of the order.[33]

## V

The Board, adopting the ALJ's findings, determined that Carey Salt's various actions toward strikers violated Section 8(a)(1), (3), and (5) of the Act. 29 U.S.C. § 158(a)(1), (3), (5).  Specifically, the Board found that Carey Salt (1) threatened to replace strikers; (2) failed to reinstate strikers; (3) failed to use seniority in recalling strikers; (4) continued to honor job offers to replacement workers; and (5) changed the time period for strikers to accept re-employment offers.  Carey Salt does not contest the first and last findings.  As to the second and fourth, Carey Salt's only line of defense is that because the strike was not

---

[32]  Heider, in a June 17 email to Union negotiators, again refused to bargain about wages absent certain conditions: "You say that if the money is right, everything else can disappear.?  [sic] Well, here, if you can give me the merit, shared work and contracting language, like money for your folks, this will open up things on my end."  Board Ex. 33(b).

[33] The ALJ cited an early Board decision for the principle that a "take it or leave it" attitude violates the duty to bargain in good faith, even when a party genuinely desires agreement.  Board Decision at 23 (citing *Gen. Elec. Co.*, 150 N.L.R.B. 192, 194 (1964).  Although we generally extend a degree of deference to prior Board decisions under *Skidmore v. Swift*, 323 U.S. 134 (1944), here, we decline to adopt the reasoning of *General Electric*.  In *General Electric*, the Board, in a fractured decision, declared that a "take it or leave it" attitude constitutes bad faith, and therefore a violation of the duty to bargain, even where the offending party desires agreement.  *Gen. Elec. Co.*, 150 N.L.R.B. at 194.  In this proclamation, the Board purported to rely on the Supreme Court's decision in *NLRB v. Insurance Agents' International Union, AFL-CIO*, 361 U.S. 477 (1960).  We need not determine today the precise meaning of the phrase "take it or leave it," but note only that the Board in *General Electric* improperly broadened its scope.  The Supreme Court explained that a "take it or leave it" attitude is mutually exclusive of a genuine "desire to reach ultimate agreement." *Ins. Agents' Int'l Union*, 361 U.S. at 485.  Therefore, a "take it or leave it" attitude, wherever the Board chooses to find it, must presuppose at least indifference to agreement.  Because the Board made no findings regarding such indifference during the conditional bargaining at issue in June, the prohibition on a "take it or leave it" attitude is inapplicable.

a protected unfair labor practice strike, it had no duties toward strikers. This defense must fail; we found above that the strike was indeed an unfair labor practice strike caused by the unlawful March 31 implementation. *See Poly-America*, 260 F.3d at 476 (holding that strikers who protest unfair labor practices are entitled to unconditional reinstatement).

Carey Salt's only remaining claim on appeal regarding its treatment of strikers is that because it had no pre-existing duty to recall strikers by seniority, its merit-based recall was lawful. Under Section 8(a)(5) and 8(d) of the Act, employers must preserve the "status quo" during negotiations until the parties reach agreement or impasse, and this status quo can be defined by an expired collective-bargaining agreement. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206–207 (1991) (holding that expired contract terms remain "imposed by law" during negotiations). Carey Salt contends that the post-strike recall presented an entirely new scenario for the company, to which no prior "status quo" agreement applied.[34] The parties do not dispute that the expired collective-bargaining agreement required that recalls be based on seniority, but Carey Salt asserts, without any factual basis, that those provisions governed only recalls following lay-offs, not those after strikes. In essence, Carey Salt attempts to characterize its merit-based recall as a wholly new measure, which, without a status quo corollary, was entirely lawful.

This contention is unpersuasive. Carey Salt's own mine manager conceded that the expired contract's seniority-based recall procedures would have applied in the post-strike context as well. Board Decision at 28; Tr. at 155–56. This conclusion comports with our own reading of the expired agreement, which does

---

[34] Carey Salt's briefing on this point is not entirely lucid, but it seems first to argue that the unilateral change in recall procedure was justified under *Pinkston-Hollar* because it tried to engage the Union on the recall issue, but the Union only rejected the offer without requesting further bargaining. We do not address this alternative defense further, as Carey Salt concedes that it is waived for lack of assertion before the Board. *See supra* Section III n.3.

not exempt post-strike recalls. Board Ex. 3(b); *see In re Liljeberg Enters., Inc.*, 304 F.3d 410, 439 (5th Cir. 2002) (contract interpretation is a question of law). Thus, given the absence of either impasse or any superseding agreement when the strike ended on June 15, Carey Salt had no power to effect a new merit-based recall procedure. Substantial evidence thus supports the Board's finding that Carey Salt unlawfully failed to recall striking employees by seniority. We accordingly enforce the relevant portion of the order.

## VI

Accordingly, the Board's order is ENFORCED in part and VACATED in part.