HONEYWELL INTERNATIONAL, INC.,Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW, Local 376, Intervenor.

Nos. 00–1170 & 00–1274.

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 2001.

Decided June 29, 2001.

Philip Allen Lacovara argued the cause for petitioner Honeywell International, Inc. With him on the briefs was Charles P. O'Connor.

Thomas W. Meiklejohn argued the cause and filed the brief for petitioner United Automobile Workers of America. Gregg D. Adler entered an appearance.

David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. David S. Habenstreit, Attorney, entered an appearance.

Philip Allen Lacovara and Charles P. O'Connor were on the brief for intervenor Honeywell International, Inc.

Thomas W. Meiklejohn was on the brief for intervenor United Automobile Workers of America.

Before: HARRY T. EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

From 1984 until October 1994, Textron Corporation operated the United States Army's Stratford Army Engine plant. Under contract with the Army, Textron produced gas turbine engines for helicopters, airplanes and tanks.

The United Auto Workers Union, Local Nos. 376 and 1010, represented many of the workers at the Stratford Army Engine plant. The unions had a collective bargaining agreement with Textron that was set to expire on May 30, 1994. On May 12, 1994, while negotiations for a new collective bargaining agreement were underway, Textron announced that it was to be acquired by AlliedSignal. (AlliedSignal has since been acquired by Honeywell International, the named petitioner in this case.)

Concerned about the impact of the change in ownership, the unions demanded that Textron collectively bargain about the effects of the proposed acquisition. The ensuing negotiations resulted in three agreements. On June 19, 1994, the unions and Textron signed a new collective bargaining agreement which incorporated two other agreements concerning "conditions and benefits which shall be applicable in the event that the Company should sell its assets to a third-party purchaser." These agreements were known as the Effects Bargaining Agreement and the Competitiveness Agreement.

Understanding the Competitiveness Agreement requires an understanding of the business at the Stratford plant. The plant produced engines for both civilian and military customers in the Army's facility under a dual lease. For many years, the plant had focused on producing tank engines for the military, but the Army was planning no further purchases of AGT-1500 engines, the plant's main product.

Despite this, AlliedSignal found Textron's Stratford business attractive because of likely additional government funding. A "blue ribbon" defense panel had recommended that the government maintain the Stratford plant's capacity to produce tank engines, should they be needed in the future as well as to continue to make improvements to current engines. The panel also recommended that the Stratford plant continue operations under a dual lease that would allow the plant's operator to produce both military and civilian engines. In all, AlliedSignal anticipated some $30 to $40 million a year in government support for its operations at the Stratford site.

Recognizing this need for continued government support, the Competitiveness Agreement included the following language:

... AlliedSignal intends to make application to appropriate officials of the United States Government for financial arrangements in an amount considered by AlliedSignal to be adequate to support the future of the Stratford Plant by AlliedSignal on a stand-by basis for the production of the AGT1500 engine, if active procurement of the engine should cease. AlliedSignal and the Union shall exert their best efforts to work together and to coordinate actively in the efforts to obtain such adequate financial arrangements from either the federal government or some alternative governmental funding source.

. . . .

After AlliedSignal makes such an application to the Government, if no provision to fund such financial arrangements in the amount sought by AlliedSignal shall be made in the federal budget as thereafter enacted by the Congress of the United States, then at any time after such next enactment of a federal budget,

AlliedSignal may terminate this Competitiveness Agreement. . . .

Pursuant to the Competitiveness Agreement, AlliedSignal and the unions worked during the summer of 1994 to obtain funding for the military's plan to maintain the Stratford plant's capacity. In September 1994, shortly before AlliedSignal completed its purchase of the plant, Congress appropriated more than $47 million to the Army to maintain the plant for fiscal year 1995.

In February 1995 the Secretary of Defense recommended closing the Stratford plant as part of ongoing efforts to reduce the size of the military. The recommendation was taken up by the Defense Base Closure and Realignment Commission. *See* Defense Base Closure and Realignment Act of 1990, Pub.L. No. 101–510, 104 Stat. 1808 (amended 1992, 1993, 1994, 1995, 1996). While awaiting the Commission's decision, the Defense Department refused to release the funds appropriated for the Stratford plant, thinking it wasteful to spend money to maintain a plant likely to be closed. The withheld funds and the ongoing review by the Commission touched off more lobbying efforts.

In April 1995, a coalition consisting of the unions, AlliedSignal and federal, state and local political representatives convinced the Department of Defense to release the funds earmarked for 1995. Efforts to influence the Commission were less successful. On June 23, 1995, the Commission decided in favor of closing the Stratford facility. Under the provisions of the Base Closure and Realignment Act, the Commission's recommendation was then sent to the President for review. The President accepted the Commission's recommendations and forwarded them to Congress, which had 45 days to disapprove of the recommendations. When it did not do so, the Stratford plant was officially

slated to be closed. On July 15, 1995, the company sent the Stratford employees a letter explaining the Commissions's decision and saying that it did not think "an economic case c[ould] be made to remain in Stratford without the ownership and support of the Army." The unions took this as a signal that AlliedSignal intended to close the Stratford plant. On September 29, 1995, AlliedSignal informed the unions that it was terminating the Competitiveness Agreement. The unions contended that AlliedSignal could not terminate the Competitiveness Agreement because the company had received funds for fiscal year 1995.

Local 1010 filed two charges against the company stemming from these events. The first charge accused the company of "fail[ing] to bargain in good faith with the ... UAW by unilaterally withdrawing the competitiveness agreement, refus[ing] to provide relevent [sic] information and refusing to bargain the decision and effects of the plant closure."

In prosecuting the case before the Board, the General Counsel claimed that AlliedSignal had violated § 8(a)(5) of the National Labor Relations Act by terminating the contract. *See* 29 U.S.C. § 158(a)(5). Section 8(a)(5) requires that the company "bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The Act further indicates that collective bargaining includes the requirement that "no party to such a contract shall terminate or modify such contract, unless the party" follows certain procedures not relevant here. 29 U.S.C. § 158(d). It is an unfair labor practice for a company to terminate or modify contract provisions regarding mandatory subjects of bargaining when the contract's term has not ended. *See Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159, 92 S.Ct. 383, 30 L.Ed.2d 341

(1971); *UAW v. NLRB*, 765 F.2d 175, 179–80 (D.C.Cir.1985). In essence the General Counsel charged that AlliedSignal had violated § 8(a)(5) by terminating all of the contract provisions before the contract's term had expired.

The Administrative Law Judge treated the question whether the term of the AlliedSignal contract had ended as a matter of contract interpretation; both parties, the ALJ thought, had reasonable arguments about the meaning of the termination clause. *See AlliedSignal Aerospace*, 330 N.L.R.B. No. 175, slip op. at 12 (NLRB Apr. 12, 2000). The ALJ drew on a long line of Board cases holding that, when an issue is one solely of contract interpretation, it will not decide the matter if the company had a "sound arguable basis" for its interpretations and the actions it took pursuant to that interpretation. *See NCR Corp.*, 271 N.L.R.B. 1212, 1213 (1984). The ALJ therefore ruled that AlliedSignal had not violated the Act.

The Board reversed. To its mind, the "sound arguable basis" test did not apply because AlliedSignal was "alleged to have repudiated the CA in its entirety." *AlliedSignal*, slip op. at 4. To the Board, "the issue of whether the Respondent could lawfully cancel the CA is more than a mere contract dispute. It is situated at the threshold of matters going to the heart of the collective bargaining relationship...." *Id.* [JA 6] Thus, the Board concluded that AlliedSignal had violated § 8(a)(5) of the Act by refusing to bargain over a mandatory subject matter. *See* 29 U.S.C. § 158(a)(5). Member Hurtgen dissented on the basis that the "sound arguable basis test" applied because this was a contract dispute.

█ The Board's decision was contrary to its own precedents. It distorted the nature of the Competitiveness Agreement on the basis of an arbitrary distinction it

had no power to make in the first place. As to its precedents, the Board claims that it has refrained from applying the "sound arguable basis" test when "the circumstances involved more than a mere matter of contract interpretation." *Id.* The three cases the Board cites hold no such thing. In *Trojan Yacht*, the Board declined to apply the "sound arguable basis" test because the dispute centered on a provision of a "side agreement" not incorporated into the collective bargaining agreement. 319 N.L.R.B. 741, 744 n. 5 (1995). If anything, *Trojan Yacht* indicates that the Board forgoes the "sound arguable basis" test not when a contract provision is central to the collective bargaining relationship—as it claims the Competitiveness Agreement is here—but when the contract issue is peripheral to the relationship. *Flatbush Manor* is also of no help to the Board. In that case, the Board upheld an ALJ's determination that an employer had committed an unfair labor practice by failing to make contractually-required pension plan payments. 315 N.L.R.B. 15, 21 (1994). Responding to a "sound arguable basis" claim, the Board concluded that the payments had "indisputably accrued" and adopted the ALJ's order. *Id.* at 15 n. 1. The only way to read this is that the Board rejected the notion that there was even a sound arguable basis for the company's defense. This is in marked contrast to the case at hand, where the ALJ concluded—and the Board did not dispute—that both parties had reasonable arguments about the meaning of the contract provisions.

Also puzzling is the Board's citation to *Oak Cliff–Golman Baking Company* as support for its decision here. In that case, one member of the Board indicated that he would affirm the finding of an unfair labor practice because there was no sound arguable basis for the employer's contract defense. *See* 207 N.L.R.B. 1063 (1973), *enforced*, 505 F.2d 1302 (5th Cir.1974). The other two members said that they would affirm the ALJ because they did not agree with the policy underlying the Board's general practice of deferring to contractual arbitration procedures. *See id.*

The short of the matter is that none of the precedents cited in the Board's opinion supported its decision regarding the arguable basis test. The reason is obvious. The Board's decision is *not* consistent with its past practice. For example, in *Cement Masons, Local 627*, the Board faced the question whether a short-term collective bargaining agreement had been properly terminated. *See* 274 N.L.R.B. 1286, 1286–87 (1985). The Board invoked the "sound arguable basis" doctrine and found that both parties had reasonable interpretations of the agreement's terms. Therefore no unfair labor practice had occurred. *See id.* at 1287–88. *Cement Masons* is indistinguishable from this case. Without more, the Board's departure from precedent without a reasoned analysis renders its decision arbitrary and capricious. *See Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C.Cir.2001).

In any event, this case may fit the Board's newly-devised "heart of the collective bargaining relationship" distinction only by distorting its facts. The Competitiveness Agreement was but one of three separate agreements between the unions and the company. They had also entered into a master collective bargaining agreement and an Effects Bargaining Agreement. It is undisputed that neither of these agreements was terminated when the company decided to terminate the Competitiveness Agreement. So, it cannot be true that the company's decision to terminate the Competitiveness Agreement constituted a repudiation of the entire bargaining relationship.

■ Factual distortions aside, the Board's approach to this case flies in the face of this court's clear precedent construing the Board's power to interpret contracts. The Board is empowered to interpret collective bargaining agreements when doing so is necessary to determine whether an unfair labor practice has occurred. *See NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 429, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967). But the federal courts, not the Board, are legislatively empowered to be the primary interpreters of contracts. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202–03, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *see also* 29 U.S.C. § 185 (granting federal district courts jurisdiction over breach of contract claims arising out of collective bargaining contracts). The boundaries of the Board's interpretive jurisdiction are marked in *C & C Plywood*: the Board may interpret a contract "only so far as ... necessary to determine" what statutory rights the party has given up by agreeing to a particular contract. *See C & C Plywood*, 385 U.S. at 428, 87 S.Ct. 559.

■ This principle is at the root of the "contract coverage" doctrine. When an "employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue." *NLRB v. United States Postal Serv.*, 8 F.3d 832, 837 (D.C.Cir.1993). And as we have often reminded the Board, when a contract's terms cover a mandatory subject of bargaining, the contract represents the result of the union's exercise of its bargaining rights. *See BP Amoco Corp. v. NLRB*, 217 F.3d 869, 872–73 (D.C.Cir.2000); *United States Postal Serv.*, 8 F.3d at 836; *Connors v. Link Coal Co.*, 970 F.2d 902, 905 (D.C.Cir.1992). An employer cannot be deemed to have "refuse[d] to bargain collectively," 29 U.S.C.

§ 158(a)(5), over a particular subject when it has bargained over that subject matter and memorialized the results in a contract. Once the Board determines that a contract covers a mandatory subject of bargaining, its interpretive task is at an end. If the parties wish to enforce their contract, they may do so pursuant to an arbitration clause or by bringing suit under 29 U.S.C. § 185.

■ The Board in this case made no attempt to determine whether the contract covers the issue of the conditions precedent to termination. This is of no moment, as we review the Board's construction of contracts de novo. *See Litton Fin. Printing*, 501 U.S. at 202–03, 111 S.Ct. 2215. It is inconceivable that the clause does not cover the conditions under which the agreement can be terminated. The Competitiveness Agreement plainly indicates that if certain conditions are met, the company may terminate the contract.

The Board's own language demonstrates that this is the case. It notes that the "parties do *not* dispute that section 6 expressly required the Respondent to take certain steps before it was permissible to cancel the agreement short of its term." *AlliedSignal*, slip op. at 4. The Board then offered a protracted analysis of the question whether the conditions precedent had actually been met. *See id.* at 4–5. Among the arguments it considered was AlliedSignal's claim that seeking further funding was futile in light of the fact that the plant was slated for closure. *See id.* at 5. Futility, of course, is an age-old *contract* defense. *See* 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS §§ 9.5–9.9a (1990). Likewise, the question whether AlliedSignal made sufficient efforts to fulfill its end of the bargain is one of contract interpretation. *See id.* § 9.1a. By injecting itself into a purely contractual

dispute, the Board assumed a role Congress denied it through 29 U.S.C. § 185.

The petition for review is granted and the Board's decision is set aside.

*So ordered.*