# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-60011

HALLMARK-PHOENIX 3, L.L.C.,

Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2016

Lyle W. Cayce
Clerk

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Hallmark-Phoenix 3, L.L.C. petitions for review of an order of the National Labor Relations Board requiring Hallmark to make severance and accrued vacation payments to its former union employees. The Board cross-applies for enforcement of its order under 29 U.S.C. § 160(e).

Hallmark is a government contractor providing vehicle maintenance services at two United States Air Force bases in Florida. In providing these services, Hallmark entered into two separate collective bargaining agreements ("CBAs") with two different unions. Hallmark lost its government contracts when the Air Force decided to go in-house with the contracted work. After the contract terminations, disputes arose under each CBA regarding severance

No. 15-60011

pay, accrued vacation pay, and other related matters. Instead of seeking arbitration under the respective CBAs, the unions filed unfair labor charges under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq*., charging Hallmark with bad faith collective bargaining by unilaterally modifying the terms of the CBAs.

The NLRB ruled largely in favor of the unions. The Board found that Hallmark violated Sections 8(a)(1), 8(a)(5), and 8(d) of the NLRA when it refused to make the disputed payments under the relevant collective bargaining agreements; included waiver language on employees' final pay checks without consulting with the unions; and refused to withhold and remit union dues from union members' final checks.

On appeal, Hallmark argues that this dispute should have been resolved under the arbitration procedures of the CBAs, and that the Board abused its discretion in exercising jurisdiction over this dispute. Hallmark further argues that, in any event, the company did not violate the NLRA because it had a "sound arguable basis" for its interpretation of the CBA provisions at issue. For the reasons set forth below, we grant Hallmark's petition in part and deny it in part. We remand this action to the Board for the limited purpose of recalculating severance pay and vacation pay so that it is consistent with this opinion. All other aspects of the Board's Order are enforced.

I.

Hallmark, a private contractor to the U.S. Air Force, provided vehicle operations maintenance services ("VOM" or "VOMS") at Patrick Air Force Base and Cape Canaveral Air Force Station, both of which are located in Florida. Hallmark's employees belonged to two different unions. The Cape Canaveral employees were represented by the Transport Workers Union of America, Local 525, AFL-CIO ("TWU"), and the Patrick employees were represented by the International Alliance of Theatrical Stage Employees and Motion Picture

## No. 15-60011

Technicians, Artists and Allied Crafts of the United States, its Territories and Canada, Local 780, AFL-CIO ("IATSE"). Hallmark entered into CBAs with each union. The two CBAs were similar, but not identical, and are discussed in further detail below. TWU's CBA was effective from October 1, 2010, to September 30, 2014. IATSE's CBA was effective from September 1, 2011, to August 31, 2014.

### A.

This dispute implicates the CBA provisions regarding severance pay, accrued vacation pay, and a $1.50 per hour "lead pay" bonus for those workers sometimes designated as "lead employees." We briefly present an overview of the provisions at issue.

In addressing severance pay, Section 20.6.1 of the IATSE CBA provides that "[a]ny employee with more than 6 months of continuous service credit, who has established seniority, shall be entitled to severance pay when involuntarily laid off because of lack of work for a period in excess of 30 days." The IATSE CBA added, however, that

> no employee shall be entitled to severance pay in cases where such layoff is due to fire, flood, explosion, bombing, earthquake or Act of God, causing damage at locations where work is performed under this agreement, or from strikes or work stoppages resulting in the inability to maintain normal operations.

Section 20.6.3 of the IATSE CBA further limited Hallmark's obligation to pay severance, stating that "[s]everance pay will not be granted when the employee accepts employment of the same, similar, or greater responsibility or skill by a Successor Contractor to the [Patrick and Cape Canaveral] VOM."

The TWU CBA contained similar provisions limiting Hallmark's obligation to pay severance. Section 30.2 stated that "[s]everance allowance will not be paid if the layoff is the result of an Act of God, a national war emergency, dismissal for cause, resignation, retirement, or a strike or

3

picketing causing a temporary cessation of work," and section 30.5 stated that "[s]everance allowance will not be granted when . . . the employee accepts employment of the same, similar, or greater responsibility or skill by a Successor Contractor to the [Patrick and Cape Canaveral] VOM."

Under the TWU and IATSE CBAs, employees also enjoyed paid vacation and were to be compensated for accrued, unused vacation time upon discharge. The TWU CBA provided that "[a]n employee who has completed his probationary period shall be paid for his accrued vacation upon termination of employment with the Company, except that he shall not be paid for such vacation if he has been discharged for a cause involving monetary or material loss to the Company." Section 27.7 of the TWU CBA also allowed for "carry over" of unused vacation hours, but added that the maximum number of hours that could be carried over was 180. Section 27.7 also stated that "[c]arry over does not apply if [Hallmark] is not the successful contractor for the rebid of VOM Contract."

The IATSE CBA contained near-identical provisions regarding vacation pay, stating that "[a]n employee who has met the prerequisites of this section and who leaves the Company's employment for any reason, or who is laid off indefinitely, shall receive pay in lieu of any unused vacation." The IATSE CBA added that "[e]mployees may accumulate vacation from year to year in an amount equal to one time their annual award. Any unused credits in excess of the maximum carryover will be paid to the employee in January of each calendar year."

Finally, both CBAs required an upward adjustment in pay for certain "lead" employees. Sections 31.3 and 32.2 of the TWU CBA provided:

> 31.3
>
> Any employee selected by Management to perform a lead function shall receive $1.50 per hour in addition to his regular straight-time base rate of pay for all hours worked as lead. If an employee

performs as a lead for 30 days or more and is off on holiday, vacation or sick leave, he shall continue to receive lead pay.

32.2

The Lead category is in direct association with a specific job assignment. Once an employee is placed in the Lead category, he retains it so long as the Company's requirement for a Lead continues. Should the requirement cease to exist or the employee vacates the assignment for any reason, he is no longer a Lead. . . .

The IATSE CBA also contained a lead-pay provision, which stated that "[a]ny employee that performs a lead function shall receive one dollars [*sic*] and fifty cents ($1.50) per hour in addition to his/her regular straight-time base rate of pay for all hours worked as a lead."

B.

This dispute originates from Hallmark's loss of the Air Force VOMS contracts for the Patrick and Cape Canaveral bases. In 2011, the Air Force told Hallmark that it intended to "in-source" VOMS at the two bases, and thus would not renew Hallmark's contract. Hallmark convinced the Air Force to postpone in-sourcing by one year, but was ultimately unable to persuade the Air Force to continue the VOMS contracts.

In June 2012, Hallmark emailed the unions to confirm that the VOMS contract would soon end. Soon after receiving the news, TWU and IATSE officials contacted Hallmark to discuss severance pay under the CBAs. Hallmark responded that it had doubts whether the company's employees were entitled to severance pay because the employees were not being "laid off" within the meaning of the CBAs; instead they were being "terminated." Hallmark further asserted that, in any event, the Air Force was responsible for severance payments to the discharged employees. Hallmark did, however, agree that employees would receive their accrued vacation pay.

Hallmark's Air Force contracts ended effective September 1, 2012. That same day, the company laid off all of its Patrick and Cape Canaveral

No. 15-60011

employees. On September 14th, Hallmark sent its former employees checks for their accrued vacation payments. IATSE and TWU took issue with the amount of the payments, and submitted grievances to Hallmark. Both unions asserted that Hallmark failed to include a $1.50 per hour "lead pay" bonus in the vacation pay for employees who had been designated lead employees. In addition, TWU argued that Hallmark failed to include "carry-over" vacation pay in its members' checks.[1]

IATSE's grievance further contested Hallmark's failure to withhold and remit union dues, and objected to Hallmark's inclusion of waiver language on its members' checks. The checks read: "By signing this check employee agrees that it has been paid all that it is owed for accrued pay and waives any and all claims for that purpose." Hallmark later stated that it would not enforce the waiver language. Hallmark initially rejected both unions' grievances as untimely.[2] Subsequently, the parties have disputed whether Hallmark later agreed to waive timeliness issues.

---

[1] As discussed *supra* page 4, under the TWU CBA, employees were allowed to "carry over," from year to year, vacation days equal to one calendar year's allowance. This allowance varied from 13 vacation days for new employees to 23 vacation days for senior employees. Under the IATSE CBA, employees were allowed a maximum yearly carry over of 180 accrued vacation hours.

[2] The TWU and IATSE CBAs' grievance sections are identical and read as follows:

All grievances shall be presented as soon as practicable after the occurrence of the event on which it is based, but in no event later than 10 working days if it is a dismissal grievance, or if the grievance arises from any other cause, no later than 20 working days from the date the union knew or reasonably should have known of the events giving rise to the grievance. The Arbitrator may consider the timeliness of the non-termination grievances filed after the 20th day and before the 45th day and may continue the matter where there is a justifiable excuse for the untimeliness. The failure to submit a grievance within a period of 45 days shall constitute an absolute bar to further action . . . . Time limits for grievances at any step, or for any response, may be extended by mutual agreement between the union and [Hallmark] . . . .

No. 15-60011

Hallmark later made an additional round of accrued vacation payments, and the parties now agree that Hallmark's vacation pay obligations have been satisfied for all IATSE non-lead employees.  Furthermore, in December 2012, Hallmark submitted a claim to the Air Force under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101, *et seq.*, for $413,803.75 in severance pay for its employees.  When submitting the claim, Hallmark stated, per the CDA's certification requirement, that the company "became obligated to pay severance at [the VOMS contract's] end to non-exempt employees as fringe benefits consistent with the provisions and conditions of each CBA."

TWU and IATSE filed unfair labor practice charges against Hallmark with the National Labor Relations Board, charging that Hallmark violated Sections 8(a)(1), 8(a)(5), and 8(d) of the NLRA by, in effect, unilaterally modifying the CBAs to avoid its severance pay and vacation pay obligations. The Board initially indicated that it would defer the dispute to arbitration.  The Board, however, ultimately issued complaints based on these charges on January 30, 2013 (TWU's charges) and February 27, 2013 (IATSE's charges), followed by a Consolidated Complaint and Compliance Specification on February 7, 2014.  The consolidated complaint alleged that Hallmark owed its employees over $370,000 in vacation and severance pay, with severance accounting for nearly all of the amount.

In April 2013, after the Board's complaints had been issued but before the hearing before the administrative law judge ("ALJ"), the Air Force agreed to pay the unions' severance demands in full.  Hallmark requested and received an extension of deadlines from the Board for the purpose of allowing the Air Force additional time to process the settlement payment.  The Air Force remitted payment of approximately $413,000 to Hallmark in September 2013. Hallmark has, however, refused to forward these funds to its former

7

No. 15-60011

employees.  Hallmark offered to pay severance in installments, but the unions rejected the offer.

## C.

The Board held a hearing on the case on March 3, 2014, before an ALJ. Hallmark reiterated its position that the employees were "terminated," instead of "laid off," thus rendering them ineligible for severance pay.[3]  Hallmark also disputed the extent of vacation pay owed under the CBAs.  The company claimed it did not owe the portion of TWU employees' carry-over vacation pay that represented carry-over vacation time in excess of Section 27.7's 180-hour maximum, and because Hallmark was not the "successful contractor for the rebid of VOM."  Hallmark also argued that it was not required to pay "lead" employees extra for their severance and accrued vacation time, as the $1.50 lead-pay bonus applied only to hours that were actually worked.  The unions produced evidence that Hallmark had historically paid lead employees the premium rate for vacation time.  Hallmark acknowledged this practice, but argued it was a mistake.

On May 17, 2014, the ALJ ruled against Hallmark in every respect. He found that Hallmark had violated Sections 8(a)(5) and 8(a)(1) of the NLRA by (1) failing to pay all owed vacation pay to the TWU members, and to timely pay all owed vacation pay to the non-lead IATSE members; (2) failing to include lead pay in the lead TWU and IATSE members' vacation checks; (3) failing to pay severance to the TWU and IATSE members; (4) failing to deduct and remit union dues from the IATSE vacation checks; and (5) unilaterally adding waiver

---

[3] During the hearing, both sides examined Kevin Ratliff, a former Hallmark employee and TWU union member at the Cape Canaveral base. After being laid off, Ratliff found work with the Air Force.  Ratliff claimed severance pay, despite the CBA's language regarding employment with "Successor Contractor[s]."  Hallmark disputes the Board's finding regarding whether Hallmark had a "sound arguable basis" for refusing Ratliff's severance. Hallmark has, however, waived any arguments on this issue. *See infra* Part III.B.2.

language to the union members' vacation checks. The ALJ recommended that Hallmark be ordered to cease and desist from these practices, pay all outstanding amounts, and notify the TWU and IATSE employees of the ruling.

Hallmark filed exceptions with the Board, along with a supporting brief, that outlined the company's objections to the ALJ's decision. On December 16, 2014, the Board affirmed and adopted the ALJ's decision, essentially in its entirety. The Board clarified that Hallmark's failure to adhere to CBAs amounted to unlawful contract modifications under Section 8(d) of the NLRA, which, in turn, amounted to an unfair labor practice under Sections 8(a)(1) and 8(a)(5).

Hallmark filed this petition for review. After full review, we grant the petition in part and deny it in part, and remand to the Board for the limited purpose of recalculating TWU employees' severance pay and carry-over vacation pay in a manner consistent with this opinion. All other aspects of the Board's decision and order are enforced.

## II.

This Court reviews the Board's factual determinations for substantial evidence. *NLRB v. Arkema, Inc.*, 710 F.3d 308, 314 (5th Cir. 2013). "'Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance.'" *Id.* (quoting *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012)). In reviewing the Board's factual determinations, "[w]e may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board, even if the evidence preponderates against the [Board's] decision." *Id.* (internal quotation marks omitted). *But see Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996) (stating that, although the Board's factual findings are accorded deference,

No. 15-60011

"[t]his Court's review of the NLRB's decision is more than a mere rubber stamp").

We review the Board's legal conclusions de novo. *El Paso Elec.*, 681 F.3d at 686. Collective bargaining agreements are interpreted "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).

## III.

### A.

Before addressing whether the Board erred in finding that Hallmark violated the NLRA, we must first determine whether the Board properly heard this dispute. Hallmark argues that the Board lacked jurisdiction over this dispute because it is essentially "a contract interpretation matter," not the subject of an unfair labor practice under the NLRA. The Board, however, has the authority to resolve contractual disputes, including those involving the terms of a CBA, whenever the dispute is necessary to the disposition of an unfair labor practice claim under the NLRA. *See NLRB v. L.B. Priester & Son, Inc.*, 669 F.2d 355, 363 (5th Cir. 1982); *see also Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 119, 124 (D.C. Cir. 2001) ("The Board is empowered to interpret collective bargaining agreements when doing so is necessary to determine whether an unfair labor practice has occurred."). Here, the failure to abide by the terms of the CBAs between the employer and the unions may, under certain circumstances, constitute a unilateral contract modification under Section 8(d) of the NLRA, which, in turn, is an "unfair labor practice" under Section 8(a).

Hallmark also argues that, even assuming that the Board could assert jurisdiction over this action as an unfair labor practice, the Board abused its discretion in doing so. Specifically, Hallmark urges that the Board should have

deferred to the arbitration procedures established under the CBAs to resolve disputes such as this one.  Under its own precedent, the Board is expected to defer to arbitration if:

> [t]he dispute arose within the confines of a long and productive collective-bargaining relationship; there was no claim of employer animosity to the employees' exercise of protected rights; the parties' contract provided for arbitration in a very broad range of disputes; the arbitration clause clearly encompassed the dispute at issue; the employer had asserted its willingness to utilize arbitration to resolve the dispute; and the dispute was eminently well suited to resolution by arbitration.

*United Tech. Corp.*, 268 N.L.R.B. 557, 558 (1984) (citing *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971)); *see also William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville and Vicinity*, 417 U.S. 12, 16–17 (1974) (approving of *Collyer*).

The Board declined to defer to arbitration because Hallmark was not willing to allow an arbitrator to address the merits of the unions' NLRA claims. As the Board noted, Hallmark had refused to waive timeliness issues regarding the unions' grievances.  *See Hallmor, Inc.*, 327 N.L.R.B. 292, 292 (1998) (stating that a "key element of the deferral policy is the parties' expressed willingness to waive contractual time limitations in order to ensure that the arbitrator addresses the merits of the dispute").  Hallmark now argues that the Board erred in finding that the company had refused to waive timeliness issues.  Hallmark contends that it was, in fact, willing to waive procedural defenses so as to allow the arbitration process to reach the merits of the unions' claims.  At oral argument, Hallmark pointed to a November 2012 email in which it stated:

> We agreed to allow the grievance and arbitration process to proceed for filing purposes, but whether other aspects of timeliness affect entitlement (or the timing of payment) was not waived.  For example, in our [June 2012] letter, [Hallmark] advised the Union that it would seek payment from the government in a claim before

having to pay any severance. The Union did not challenge that in a timely manner, and we will not agree to arbitrate the issue. *What we did agree to arbitrate is whether we are dealing with a lay off or a termination.* If the former, liability is triggered for the [Air Force], but not for [Hallmark] until the government pays what it owes.

(Emphasis added.)

Thus, according to Hallmark, because it agreed to arbitrate the unilateral modifications to the severance pay and vacation pay provisions, the Board's refusal to defer to arbitration was an abuse of discretion. Yet, in a subsequent letter, Hallmark, frustrated with negotiations, advised the unions that Hallmark would consider filing its own unfair labor practice charges and, more importantly, that Hallmark "will not waive timeliness issues resulting from [Hallmark's] July 9, 2012 letter" (i.e., the letter first asserting that Hallmark was not obligated to pay severance under the CBAs).

Hallmark's December 2012 assertion that it would not waive procedural defenses is not a stray remark. To the contrary, on numerous occasions the company has contradicted its November 2012 statement that it was willing to arbitrate. In fact, Hallmark ignores that the NLRB initially did defer this matter to arbitration, and only retracted its deferral once Hallmark told the Board that its deferral letter overstated the company's willingness to waive timeliness issues. According to the Board, Hallmark informed it by letter that the company's timeliness concessions "dealt specifically with the FILING relating to severance and vacation, not the delays associated with the claimed remedy on the merits." Even now, on appeal, Hallmark states only that it agreed to waive "certain" timeliness issues.

In sum, Hallmark's statements regarding its willingness to allow an arbitrator to address the merits of the unions' charges have been inconsistent, if not wholly unclear. Accordingly, the Board did not err in asserting jurisdiction over the unions' NLRA claims.

No. 15-60011

B.

Having determined that the Board did not abuse its discretion in asserting jurisdiction over this matter, the Court now turns to whether the Board erred in finding that Hallmark violated Sections 8(a)(1), 8(a)(5) and 8(d) of the NLRA.  Under Section 8(a) of the Act,

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. §§ 158(a)(1),(a)(5).

Section 8(d) sets forth the perimeters of an employer's duty to "collectively bargain," and prohibits an employer from unilaterally altering the terms of a CBA while it is in effect.  *See* 29 U.S.C. § 158(d)(4) (stating that employees' obligation to bargain "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract"); *see also Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339, 342 (4th Cir. 1995) ("An employer's duty under § 8(d) to engage in collective bargaining prohibits it from unilaterally terminating or modifying a collective bargaining agreement during the effective term of the agreement."). As stated, a violation of Section 8(d) is an "unfair labor practice" under Sections 8(a)(1) and 8(a)(5) of the NLRA.  *Carey Salt Co. v. NLRB*, 736 F.3d 405, 411 (5th Cir. 2013).

When assessing an unfair labor practice charge based on a unilateral CBA modification, the Board applies the "sound arguable basis" standard.

13

No. 15-60011

*Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14, 22 (1st Cir. 2007). "Where an employer has a sound arguable basis for its interpretation of a contract and is not motivated by union animus or . . . acting in bad faith, the Board ordinarily will not find [an unlawful contract modification]." *Bath Iron Works Corp.*, 345 N.L.R.B. 499, 502 (2005) (internal quotation marks omitted), *enforced sub nom. Bath Marine Draftsmen's Ass'n*, 475 F.3d 14; *see also NLRB v. Daycon Products Co.*, 512 F. App'x 345, 350 (4th Cir. 2013) (unpublished opinion) ("Though the Board has provided little guidance as to what makes an argument 'sound' and 'arguable,' it has focused on reasonableness, stating that where both parties 'present[] reasonable interpretations of the applicable contract language' the employer has a sound arguable basis and there is no unfair labor practice." (internal citation omitted) (quoting *Bath Iron Works Corp.*, 345 N.L.R.B. at 503)).

The Board determined that Hallmark lacked a sound arguable basis for refusing to make severance payments to its employees, and that its refusal to pay severance thus constituted a unilateral contract modification under Section 8(d) of the NLRA. The Board further found that Hallmark lacked a sound arguable basis for refusing to pay accrued vacation time for its TWU-represented employees, including the $1.50 per hour "lead pay" wage differential for those workers designated as "lead employees." We now turn our attention to those findings of the Board.

1.

Hallmark contends that the Board erred in rejecting the company's interpretations of several provisions regarding severance pay. First, Hallmark argues that its former employees are not entitled to severance pay because they were "terminated," not "laid off." Both the IATSE and TWU CBAs provide severance specifically for "laid off" employees, but the CBAs do not define the term. *See* TWU CBA Section 30.1 ("An employee with one year or more of

14

service under this Agreement who is laid off for any reason other than those set forth in paragraph 30.2 and 30.5 shall receive severance pay. . . ."); IATSE CBA Section 20.6.1 ("Any employee . . . shall be entitled to severance pay when involuntarily laid off because of lack of work for a period in excess of 30 days . . . ."). Hallmark argued to the Board that, whereas a "layoff" is inherently temporary, its employees have permanently lost their jobs due to in-sourcing, and thus were "terminated" instead.

We think that the Board did not err in finding that Hallmark's purported distinction between "laid off" and "terminated" employees lacked a sound arguable basis. In its common usage, the term "layoff" is interchangeable with "termination," as both can be used to refer to the permanent loss of employment. *See, e.g.*, *Layoff*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The termination of employment at the employer's instigation, usu. through no fault of the employee; esp., the termination—either temporary or permanent—of many employees in a short time for financial reasons."). There is no language in the CBAs that supplants the terms' common and overlapping definitions. In fact, the CBAs apparently consider "lay off" and "termination" to be interchangeable. For example, Article 33 of the TWU CBA addresses "Termination of Employment," yet the provision states that those employees "*laid off* through no fault of their own shall receive two weeks' notice."

Hallmark also argues that IATSE-represented employees are not entitled to severance pay since they lost their jobs because of a "strike[] or work stoppage[] resulting in the inability to maintain normal operations." *See* IATSE CBA 20.6.1 ("[N]o employee shall be entitled to severance pay in cases where such layoff is due to fire, flood, explosion, bombing, earthquake or Act of God . . . *or from strikes or work stoppages resulting in the inability to maintain normal operations*." (emphasis added)). The ALJ found that Hallmark's contention that the Air Force's cancellation of the VOMS contract was a "work

stoppage" lacked a sound arguable basis. According to the ALJ, the term "work stoppages" clearly covered actions taken by the employee unit, and did not contemplate the loss of the VOMS contract.

Again, the Board did not err in finding that Hallmark lacked a sound arguable basis for its interpretation. In the context of both federal labor law and common usage, "strike" and "work stoppage" mainly refer to an employee-initiated halt of normal business activity. *See* 29 U.S.C. § 142(2) ("The term 'strike' includes any strike or other concerted stoppage of work by employees . . . ."); *see also Work Stoppage*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A cessation of work; strike."). As the ALJ correctly noted, any ambiguity regarding the term "work stoppage" is cured when read together with the neighboring "strikes." *See Thibodeaux v. Grasso Prod. Mgmt., Inc.*, 370 F.3d 486, 491 (5th Cir. 2004) (stating, in the context of statutory interpretation, that "the canon *noscitur a sociis*, 'a word is known by the company it keeps,' is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth" (internal quotations omitted)).

The IATSE CBA provides no basis for expanding the definition of "work stoppage" to include the loss of the VOMS contract, which is an event removed from the employees' control. Accordingly, the Board did not err in finding that Hallmark lacked a sound arguable basis for its proffered interpretation.

2.

Hallmark offers numerous other arguments regarding severance pay. The company urges that TWU members are ineligible for severance pay because of the TWU CBA's "Duration of Agreement" clause, which asserts that the CBA "shall be null and void for any period(s) for which the Company is not a prime service contractor." In addition, Hallmark takes issue with the ALJ's finding regarding severance pay to Steven Ratliff, a former TWU-represented

employee who accepted a job with the Air Force after being fired.  Hallmark contends that, because Ratliff accepted a job "of greater responsibility and skill" with the Air Force after being laid off from his employment with Hallmark, he is not entitled to severance pay.  *See* TWU CBA Section 30.5 ("Severance allowance will not be granted when . . . the employee accepts employment of the same, similar, or greater responsibility or skill by a Successor Contractor to the [Patrick or Cape Canaveral] VOM.").

The Court need not—and, in fact, cannot—consider any of the above-listed arguments, however, because Hallmark waived these arguments by not making them before the Board.  *See* NLRA § 10(e), 29 U.S.C. § 160(e) ("No objection [to the ALJ's decision] that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *see also Woelke v. Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982) (asserting that, under Section 10(e) of the NLRA, a court of appeals "lacks jurisdiction to review objections that were not urged before the Board").

3.

Finally, the reasonableness of Hallmark's severance-related arguments is called into question by Hallmark's own actions.  Prior to the hearing before the ALJ in March 2014, Hallmark accepted funds from the Air Force to pay its former employees' severance.  Hallmark received these funds only after it unconditionally stated to the Air Force that, under the terms of the CBAs, the company was required to make the contested severance payments.  Hallmark has since refused to forward the money to its former employees.  The Board cited Hallmark's inconsistent interpretations of the CBAs' severance

provisions as further reason for finding that Hallmark lacked a sound arguable basis for denying severance payments to its employees. We agree.[4]

When this dispute first arose in July 2012, Hallmark's refusal to pay severance was based largely on the Air Force's hesitancy to reimburse Hallmark's severance costs. In fact, Hallmark has represented, numerous times, to both the unions and the Board, that payment by the Air Force would resolve this matter. *See, e.g.*, Letter from Hallmark's Counsel to NLRB (April 18, 2013) ("As [Hallmark] has stated all along, if the [Air Force] paid severance payments to [Hallmark], those payments would be passed along to [Hallmark's] former employees.").[5] In April 2013, the Air Force agreed to pay severance. For a period of time following the Air Force's concession, Hallmark appeared to be of the (likely appropriate) mindset that the Air Force settlement ended this dispute; the company even sought and received an extension of Board deadlines for the purpose of allowing Hallmark time to receive the settlement payment and divide it among the company's former employees.

Unexpectedly, and without explanation, Hallmark announced that the Air Force payment did not resolve this dispute. Hallmark now argues that, despite its own willingness to take the earmarked settlement funds from the Air Force, the company's former employees are not entitled to the money. This circuit has long considered an employer's guile or irreconcilable conduct "away from the bargaining table" to be evidence of bad faith in labor negotiations and

---

[4] In agreeing that Hallmark's inconsistent interpretations are further evidence that the company lacks a sound arguable basis for denying severance pay, the Court does not rely on Hallmark's representation to the Air Force that severance was owed under the CBAs. This is because, in an effort to prevent fraudulent claims, the Contract Disputes Act requires contractors to certify all claims submitted to the government under the Act. *See* 41 U.S.C. § 7103(b). The Court does, however, rely on Hallmark's broader course of conduct regarding severance pay, including its decision to actually accept the severance funds from the Air Force, even while continuing to deny that severance is due under the CBAs.

[5] The letter referenced is part of the official administrative record, and is marked Unions' General Council Exhibit No. 1(v).

No. 15-60011

disputes. *See Carey Salt*, 736 F.3d at 412; *Cagle's Inc. v. NLRB*, 588 F.2d 943, 948–49 (5th Cir. 1979). Simple reasoning suggests that, in the absence of any justifiable explanation, an employer's shifting positions regarding its responsibilities under a CBA can also show that the employer lacks a "sound arguable basis" for its present interpretation of the agreement.[6]

Hallmark offers numerous reasons why its inconsistent past position regarding severance pay should not affect the soundness of its current arguments. Principally, Hallmark urges that the severance funds provided by the Air Force were conditionally provided to Hallmark. The record does not support this assertion. In fact, the evidence indicates that, as late as April 2014, the Air Force was under the impression that the funds had already been paid to Hallmark's former employees. In April 2014, after the ALJ's unfavorable decision, the Air Force inquired about a mere $10,400 of the over $400,000 it gave to Hallmark, as it was the Air Force's understanding that Hallmark had settled that action for $10,400 less than given to the company by the Air Force. In response to the Air Force's inquiry, Hallmark asserted that it was premature to seek return of the funds at issue, since the Board could still "refuse to ratify" any agreement between the unions and Hallmark.[7] The Air Force responded that, although it would not seek to recover the $10,400 presently, it would seek a return of any funds "not actually paid" to Hallmark's former employees.

---

[6] Accordingly, we do not reject the argument that an employer's wholly irreconcilable or duplicitous conduct may, alone, undermine its preferred interpretation of a CBA such that it lacks a "sound arguable basis." Neither do we address this sort of conduct as a solitary reason for holding that Hallmark lacked a sound arguable basis for refusing severance payments, as the Board has not made the argument.

[7] It is unclear from the record before us why Hallmark told the Air Force that there was an agreement in place for the Board to "ratify," since Hallmark's position before the Board was that it did not owe its former employees any severance pay.

The Court does not doubt that the Air Force will demand that Hallmark repay any money that is not actually owed to its employees. It does not follow, however, that the Air Force required a court or arbitrator to find Hallmark liable under the CBAs before the company could pass the money to its employees. Hallmark's efforts to impose such a condition on the Air Force's settlement payment are at odds with the purpose of the Contract Disputes Act's claim certification requirement, which seeks in part to promote final settlement of government contract disputes. *See Isles Eng'g & Const., Inc. v. United States*, 26 Cl. Ct. 240, 243 (1992) ("The intent of CDA certification is to discourage submission of spurious and inflated contractor claims *and to encourage settlement of disputes*." (emphasis added)).

Hallmark's other reasons for refusing to forward the Air Force settlement to its former employees include financial hardship, competing claims on the funds by creditor banks, and the unions' refusal to negotiate a payment plan. None of these reasons, however, offer a sound arguable basis for denying severance pay under the CBAs. In fact, none of the reasons are grounded in an interpretation of CBAs at all. Instead, in citing its financial troubles, Hallmark essentially argues that, although the CBAs require severance pay for the company's discharged workers, Hallmark's own financial situation has caused it to forego these obligations. Yet, "the law is clear that a party may not escape its obligations under a collective bargaining agreement because of financial difficulties." *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1315 (5th Cir. 1988).

In sum, the Board did not err in finding that Hallmark lacked a sound arguable basis for denying severance payments to its former employees, such that its refusal to do so constituted a violation of the NLRA. So, we now turn to consider the Board's finding that Hallmark's refusal to pay accrued vacation

No. 15-60011

time also constituted a unilateral contract modification, and thus an unfair labor practice under the NLRA.

C.

As we have earlier noted, the parties agree that Hallmark has paid all vacation pay owed to non-lead IATSE employees. Thus, the only vacation pay still in dispute is an unspecified amount of "carry-over" vacation pay for TWU employees, and the inclusion of $1.50 "lead pay" differential in lead employees' accrued vacation pay. Our task here, as with the unpaid severance pay, is simply to determine whether Hallmark's refusal to make these payments lacks a sound arguable basis in the CBAs so as to constitute an unfair labor practice, as indeed the NLRB concluded.

Hallmark asserts that it does not owe carry-over vacation pay to TWU employees because Hallmark was not the "successful contractor on the rebid of [the] VOM contract. *See* TWU CBA Section 27.7 ("Carry over does not apply if [Hallmark] is not the successful contractor for the rebid of VOM Contract."). The Board dismissed this argument as lacking any sound arguable basis in the CBAs. The Board reasoned that the "rebid of VOM" clause was inapplicable because the Air Force decided to in-source the vehicle maintenance work at the Patrick and Cape Canaveral base, instead of accepting bids from other contractors. According to Hallmark, the Air Force acted as its own contractor when in-sourcing the work. Hallmark points to the fact that, prior to in-sourcing the VOMS contract, the Air Force performed a cost assessment in which it compared the cost of continuing Hallmark's contract with the likely cost of in-sourcing VOMS. Hallmark contends that this process was akin to the normal rebid process, such that the "rebid of VOM" clause should be given effect.

Although Hallmark's argument ultimately may be unconvincing, it is not implausible. The Board's task when interpreting a contract for the purpose of

21

No. 15-60011

an unfair labor practice charge is merely to assess whether the employer's proposed interpretation has some reasonable basis. *See In re NRC Corp.*, 271 N.L.R.B. 1212, 1213 (1984) (stating that, when "an employer has a sound arguable basis for ascribing a particular meaning to his contract and his action is in accordance with the terms of the contract as he construes it," the Board should not weigh in on the dispute (internal quotations omitted)). Hallmark's proffered interpretation—i.e., that the "rebid of VOM" clause applies in situations where the Air Force decides to in-source the VOMS contract through a process akin to the normal rebid process—is not unreasonable. Thus, the Board erred in dismissing the argument for the Board's preferred interpretation.[8]

Furthermore, the wording of the "rebid of VOM" clause suggests that, when entering into the CBA, neither party accounted for the possibility that the Air Force might in-source VOMS. The clause states that if Hallmark is "not the successful contractor on *the* rebid of VOM contract." The use of the definite article "the" arguably indicates that both Hallmark and the unions assumed, if incorrectly, that the Air Force would continue to contract VOMS out, and thus did not intend the "successor contractor" language to preclude application of the "rebid of VOM" where Hallmark loses the contract because the VOMS work is in-sourced instead of contracted to another bidding company.

Accordingly, we conclude that the Board erred in finding that Hallmark lacked a sound arguable basis for refusing to pay TWU employees' carry-over

---

[8] Importantly, the Board did not address whether the evidence supported Hallmark's argument that the in-sourcing process was akin to the normal rebid process. Instead, the Board found that, as a matter of law, the clause did not apply in a situation where the work at issue was in-sourced. Thus, the Board's conclusions on this point are not entitled to the more deferential "substantial evidence" standard of review, and are instead reviewed de novo.

vacation pay. Although an arbitrator or court may determine that carry-over pay is owed under the TWU agreement, Hallmark's refusal to make such payments is not based on an unreasonable interpretation of the CBAs, and thus is not an unfair labor practice under the NLRA.

## D.

Finally, we consider whether the Board erred in finding that Hallmark also lacked a sound arguable basis for refusing to include the $1.50 "lead pay" wage differential in lead employees' severance and vacation pay. Again, Section 10(e)'s jurisdictional bar is implicated here.[9] Hallmark's exceptions to the ALJ's findings, filed with the Board, do not discuss lead pay at all, and the company's supporting brief makes objections only with respect to the inclusion of lead pay in TWU employees' severance and vacation pay. Accordingly, Hallmark has waived any objections to the ALJ's findings regarding the inclusion of lead pay for IATSE employees. We thus move on now to consider Hallmark's un-waived arguments with respect to the lead pay only for TWU employees.

## 1.

First, Hallmark asserts that, under the TWU CBA, employees are not entitled to a "lead pay" premium with respect to accrued vacation pay. The Board, however, found that Hallmark lacked a sound arguable basis for this position. The Board pointed out that the TWU CBA required lead pay "if a [lead] employee . . . is off on holiday, *vacation*, or sick leave." *See* TWU CBA 31.3 (emphasis added). Furthermore, the Board noted that, contrary to Hallmark's current position, the company had historically included lead pay in its lead employees' accrued vacation pay.

---

[9] *See* NLRA § 10(e), 29 U.S.C. § 160(e) (stating that a party waives any exception to the ALJ's ruling that was not first raised before the Board).

No. 15-60011

The TWU CBA, standing alone, does not inarguably require that lead pay be included in employees' accrued vacation payments. Section 31.3 of the TWU CBA states only that an employee who "*is* . . . off on vacation" is entitled to lead pay. The use of the present-tense "is" arguably suggests that lead pay does not apply to accrued vacation pay. A person seeking accrued vacation is, after all, not even a current Hallmark employee, much less an employee that is currently "off on vacation."

Hallmark's admitted practices regarding accrued vacation pay do, however, warrant a finding that Hallmark lacked a sound arguable basis for withholding lead pay from vacation payments. Hallmark has historically included lead pay in its employees' accrued vacation pay. The Board relied on this evidence of past practice when finding that Hallmark's contrary position regarding lead pay lacked a sound arguable basis. This Court agrees, and notes the deferential "substantial evidence" standard for reviewing the NLRB's determination regarding the past payments' significance. *See Manville Forest Prods. Corp. v. United Paperworkers Int'l Union, AFL-CIO*, 831 F.2d 72, 76 (5th Cir. 1987) ("[P]recedents clearly support using past practice and negotiating history to resolve ambiguities and gaps in written collective bargaining agreements."); *see also L.B. Priester & Son*, 669 F.2d at 363 (asserting that, when extrinsic evidence is considered to resolve ambiguity, "the inquiry [is] essentially factual," and adding that "factual findings by the NLRB are to be upheld if supported by substantial evidence based on the record as a whole").[10]

---

[10] Hallmark's contention that the past practice of including lead pay in accrued vacation payments was a "mistake" does not warrant a finding that the Board lacked substantial evidence for its finding regarding the past payments' significance.

2.

The Board also found that Hallmark lacked a reasonable basis for refusing to include the lead-pay premium in the severance pay of TWU employees. Unlike its finding regarding the inclusion of lead pay in vacation pay, however, the Board did not cite a specific provision in the TWU CBA requiring lead pay to be included in severance pay. The TWU CBA states that employees are entitled to lead pay for "all hours worked as lead." Although the CBA goes on to discuss lead pay with respect sick leave, holidays, and vacation time, the contract is silent regarding lead pay with respect to severance payments. Furthermore, whereas there is evidence that Hallmark historically included lead pay in vacation payments, no such evidence exists with respect to severance payments. Finally, on appeal, the Board does not defend its decision to include lead pay in the severance pay for TWU employees, and instead discusses lead pay only in the context of TWU employees' accrued vacation payments.

Hallmark has, at the very least, a "sound arguable basis" for asserting that TWU employees are not entitled to the lead-pay premium in their severance payments. The contract is silent on the issue, and employees seeking severance pay are, as a result of being laid off, not "currently" working as a lead employee. Accordingly, the Board erred in finding that Hallmark violated the NLRA by refusing to include lead-pay premium in the severance pay of TWU employees.

E.

Lastly, Hallmark contends that the Board erred in ruling that Hallmark violated the NLRA when the company included a waiver-of-claims statement on employees' final pay checks, and when it failed to subtract union dues from IATSE employees' checks. Hallmark does not contend that the CBAs allowed these actions. Instead, Hallmark urges that any dispute regarding the waiver

language and union dues was rendered moot when, prior to the hearing before the ALJ, the company paid the IATSE dues and disavowed the waiver language.

An employer's voluntary cessation of the alleged unfair labor practice does not, by itself, moot an action seeking enforcement of a Board order. *See Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 509 (5th Cir. 2002) (stating that "'compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court'" (quoting *NLRB v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567 (1950))).   Instead, a dispute regarding unfair labor practices is rendered moot only when "'there is no reasonable expectation that the wrong will be repeated.'" *Cagle's*, 588 F.2d at 951 (quoting *NLRB v. Raytheon Co.*, 398 U.S. 25, 28 (1970)).  Such is not the case here, as Hallmark has yet to pay the lead-pay difference in accrued vacation pay for both unions' employees.  Thus, there is still an opportunity for Hallmark to refuse to deduct any still-owed union dues and to seek to enforce the waiver language.  Finally, even if the current situation could potentially warrant a finding of mootness, Hallmark has failed to meet its burden in demonstrating that the dispute regarding dues remittance and waiver language is, in fact, moot.  *See Raven Servs.*, 315 F.3d at 509–10 ("Raven as petitioner bears the burden of introducing evidence that shows an enforcement order request is moot,  [and] the absence of evidence . . . in the record [regarding mootness] means its . . . argument fails." (internal citation omitted)).

## IV.

For the foregoing reasons, Hallmark's petition for review is GRANTED in part and DENIED in part.  The Board's cross-petition is also GRANTED in part and DENIED in part.  We hold that (1) the Board did not abuse its discretion in asserting jurisdiction over the unions' unfair labor practice

charges; (2) the Board did not err in finding that Hallmark lacked a sound arguable basis for denying union employees' severance pay, that denying payment amounted to a unilateral modification of the CBAs, and thus constituted an unfair labor practice under the NLRA; and (3) the Board similarly did not err in finding that Hallmark violated the NLRA when it refused to include the lead-pay premium in TWU employees' accrued vacation pay. On the other hand, we hold that (1) the Board erred in finding that Hallmark lacked a sound arguable basis under the CBAs for not including the lead-pay premium in TWU employees' severance pay; and (2) the Board further erred in finding that Hallmark lacked a sound arguable basis for withholding carry-over vacation pay for TWU employees.

Accordingly, this case is REMANDED to the Board for the limited purpose of calculating TWU-represented members' severance pay minus the lead-pay differential, and adjusting TWU-represented employees' carry-over vacation pay in manner consistent with this opinion. All other aspects of the Board's order are ENFORCED.